IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN  DIVISION

| | |
|---|---|
| THE WORNICK COMPANY, | ) CASE NO. 1:11-CV-391-SJD |
| Plaintiff, | ) |
| | ) CHIEF JUDGE SUSAN J. DLOTT |
| v. | ) |
| | ) **MEMORANDUM IN SUPPORT OF** |
| HOUSTON CASUALTY COMPANY, | ) **DEFENDANT HOUSTON CASUALTY** |
| | ) **COMPANY'S MOTION FOR SUMMARY** |
| Defendant. | ) **JUDGMENT** |
| | ) |

## I.  INTRODUCTION

Plaintiff the Wornick Company's ("Wornick") lawsuit involves a dispute with its insurer,
Defendant Houston Casualty Company ("HCC"), over whether Wornick is entitled to coverage
for certain costs resulting from the reworking of hundreds of thousands of Meals Ready to Eat
("MREs") that Wornick had already sold and shipped to its customer, the U.S. Military.
Wornick sought coverage for these costs under Section 2 ("Accidental Product Contamination")
of a "Malicious Product Tampering / Accidental Product Contamination" Policy, Policy No.
H708-80163 (the "Policy") despite the fact that, after extensive testing, none of its products
tested positive for salmonella contamination.   HCC denied coverage for a simple reason:
Wornick's claim is the result of a recall – not a contamination – and Wornick purchased a
contamination policy.  The Policy does not cover losses resulting from contamination of another
entity's products or equipment, from a recall or, for that matter, from the possibility of
contamination.  Instead, the Policy only covers losses directly resulting from an ACCIDENTAL
PRODUCT CONTAMINATION – a defined term.[1]

---

[1] Capitalized words or terms are specifically defined in the Policy.

Since none of Wornick's alleged losses directly resulted from an ACCIDENTAL PRODUCT CONTAMINATION, and since there is no basis for Wornick's bad faith claim, HCC respectfully requests summary judgment as to Wornick's claims for breach of contract (Count II) and bad faith (Count III), and a declaration (Count I) that Wornick is not entitled to coverage under the Policy.

## II.  FACTUAL BACKGROUND

### A.  Wornick Supplies MREs To Its Customer, the U.S. Military.

Wornick is a supplier of convenience foods and military rations.  (Compl. at ¶ 1, Doc. 1.) One of Wornick's product lines is the MRE, which it supplies to its customer, the U.S. Government and, in particular, the Department of Defense (collectively, the "U.S. Military"). (*Id.* at ¶ 2; Decl. of Lester Weiss, attached hereto as Ex. 1, at ¶¶ 4-5, 11 & 13.)  An MRE is an operational ration that includes dairy shake packets containing dry milk powder.  (Compl. at ¶¶ 25-27; Ex. 1 at ¶ 5.)  Wornick purchased dairy shake packets for its MREs from Trans-Packers Services Corp. ("Trans-Packers").  (Compl. at ¶¶ 25-27; Wornick Claim Submission, attached hereto as Ex. 4 at HCC00684; *see also* Decl. of Karl Smith, attached hereto as Ex. 3, at ¶ 5.) Trans-Packers, in turn, purchased dry milk powder from Franklin Farms East, Inc. ("Franklin Farms"), which purchased it from Plainview Milk Products Cooperative ("Plainview").  (*Id.*)

### B.  On June 23, 2009 Plainview Issued a Recall of Dry Milk Powder.

Dairy shakes manufactured by Trans-Packers between 2002 and 2009 were produced under the on-sight supervision of government inspectors.  (Ex. 1 at ¶ 15; Compl. at ¶¶ 28-30.) On or about May 28, 2009, salmonella contamination was found in Lot #9133 of dairy shake powder at Trans-Packers' facilities in New York.  (Wornick Resps. to HCC's First & Second Set

Interrog. & Req. Admis., attached hereto as Ex. 2, at Resp. to Interrog. No. 19.)  After the finding, the FDA commenced an investigation, testing for salmonella contamination.  (Ex. 1 at ¶ 17; Compl. at ¶¶ 31-32.)  The FDA ultimately found salmonella in one other place – on manufacturing equipment at Plainview's facilities in Minnesota.  (Ex. 2 at Resp. to Interrog. No. 19.)  After salmonella was found on its equipment, Plainview issued a voluntary recall on June 23, 2009 for dry milk products produced at its facility since June 4, 2007 (the "Plainview Recall").  (*Id.*; Compl. at ¶ 34.)  The Plainview Recall spread down the distribution chain: on June 25, 2009, Franklin Farms issued a recall notice and sent it to Trans-Packers, one of its customers; and, on June 26, 2009, Trans-Packers issued a recall notice to its customers, including Wornick.  (Compl. at ¶¶ 34-37.)[2]

### C.       After the Plainview Recall, the U.S. Military Demanded That Wornick Rework Hundreds of Thousands of MREs.

After the Plainview Recall, Wornick's customer, the U.S. Military, notified Wornick of its intent to invoke a breach of warranty clause in its contract with Wornick.  (Compl. at ¶ 42 & Ex. G (attached to Compl.).)  Ultimately, the U.S. Military demanded that Wornick "assume all costs" for recalling, shipping, removing, replacing, and reshipping approximately 700,000 MREs (including the dairy shakes they contained), which the U.S. Military had already purchased and received from Wornick.  (Compl. at ¶ 45 (noting that Wornick had to "recall[], ship[], remove[], replace[] and re-ship[]" the MREs); Ex. 4 at HCC00683-HCC00684).)[3]  Wornick complied with

---

[2] Copies of the Plainview, Franklin Farms, and Trans-Packers' Recall Notices are attached to Wornick's Complaint as Exhibits B-D.

[3] Wornick's Chief Financial Officer, Dustin McDulin, explained that Wornick's customer, the U.S. Military "demanded [Wornick] repair and replace the Dairy Shake in approximately 700,000 cases.  The costs to us are between $3.50-$4.50 per case to bring them back to our location, replace the Dairy Shake and send the cases back to the [U.S. Military].  This puts the total costs at between $2.4MM and $3.2MM.  The [U.S. Military] did a bid to fix the cases, and were going to award to Ameriqual, but we worked to stop them and agreed to perform the work as a

this demand and "recalled and re-worked" approximately 700,000 cases of MREs.  (*Id.*; Compl. at ¶ 46.)  A number of the dairy shakes that Wornick replaced were not a part of the Plainview Recall.  (Ex. 2, Resp. to Admis. No. 24.)

> **D.    After Complying With Its Customer's Demand, Wornick Sought Coverage Under the Policy.**

After the Plainview Recall, Wornick made a claim to HCC for coverage under the Policy.  As Wornick explained in its claim submission, the lots it claims were "contaminated . . . were shipped to Wornick between 10/23/2007 to 12/02/2008. These lots were used in the MREs from 11/13/2007 to 05/19/2009.  As a result of the contamination, 700,000 cases were recalled and reworked."  (Ex. 4 at HCC00683-HCC00684; *see also* Compl. at ¶¶ 45-46.)  Ultimately, HCC denied Wornick's claim because Wornick's losses did not directly result from an ACCIDENTAL PRODUCT CONTAMINATION and, therefore, were not covered under the Policy.  (*See generally* Compl. at ¶¶ 47-52 & Exs. I-J (attached to Compl.).)

> **E.    Despite Extensive Testing And Consumption of MREs Affected by the Plainview Recall, Salmonella Contamination Has Only Been Found in Two Places – And Never On Wornick's Product.**

There have only been two findings of salmonella contamination before, during, or after the Plainview Recall: (1) the finding in Lot #9133 of dairy shake powder at Trans-Packers' facilities in New York on or about May 28, 2009; and (2) the finding on Plainview manufacturing equipment on or about June 19, 2009.  (Ex. 2 at Resp. to Interrog. No. 19.)  None of the dairy shake product in Lot #9133 was sold to Wornick, which is only one of Trans-Packers' customers.  (Exs. 2 at Resp. to Admis. Nos. 15 ("Wornick admits that it does not have

---

Customer Service function, while retaining our rights under the contract . . . ."  (McDulin Email, attached hereto as Ex. 7; *see also*, Decl. of Michael Tocicki, attached hereto as Ex. 6, at ¶ 3.)

4

knowledge of Trans-Packers having sold to Wornick Dairy Shakes from Lot # 9133.") & 18 ("Wornick admits that at the time of the 2009 dairy powder recall Trans-Packers sold dairy shakes to persons other than Wornick."); *see also id.* at Nos. 13-14, 16-17, 19; Ex. 1 at ¶ 4.)

Further, there have been no reported instances of bodily injury, sickness, disease, or death that resulted from the consumption or use of Wornick's products. (Ex. 2 at Resp. to Admis. No. 11 ("Wornick admits that it has not been made aware of any actual bodily injury, sickness, disease, or death that resulted from the consumption or use of Wornick's products.").) This is significant given the amount of testing and consumption of dry milk powder that has occurred. Indeed, as Wornick's CFO explained: "the AVI, the US Government regulatory agency that does checks and verifications on the production process, performed significant checks for Salmonella during the normal production process and found no contamination." (Ex. 7.) Further, Wornick's attorneys asserted in their statements to Wornick's customer, the U.S. Military, that:

- "[E]xtensive testing" was "performed by the dairy shake powder manufacturers and by the United States Department of Agriculture ("USDA")" and "[a]t no time during the term of the Contract has any dairy shake powder supplied to DSCP been found to be out of compliance . . . ." (Dinsmore & Shohl LLP Letter, attached hereto as Ex. 8, at MT00162-MT00163.)

- "[T]he extensive, mandated testing conducted by USDA during the course of the Contract revealed that the dairy shake powder was in compliance with the terms and specifications of the Contract." (*Id.* at MT00166.)

- "[T]he dairy shake powder was subject to Higher Level Contract Quality Requirements and was subject to periodic review sampling and microbiological testing specifically for Salmonella by USDA in accordance with the Contract specifications and performance requirements. Moreover, Salmonella testing was conducted in accordance with the requirements of the Official Methods of Analysis (OMA) of AOAC International and/or the FDA Bacteriological Analytical Manual" and the certifications from these tests "demonstrate[es] that the products now deemed contaminated by DSCP actually satisfied applicable Contract requirements." (*Id.*)

5

- "In fact, documentation from the FDA that we obtained through a Freedom of Information Act request indicated that FDA conducted Salmonella testing in June 2009 (prior to Plainview's initiation of its recall of NDFM [instant nonfat dried milk]) on certain NFDM samples from Plainview, each of which resulted in no detection of Salmonella" (*Id.*)

Likewise, Lester Weiss, Trans-Packers' Chief Operating Officer explained that, in supplying dry milk powder for use in MREs:

- "To comply with the Government's strict product handling and testing of food product methodology, at all times relevant to Wornick's claim, and at present, Trans-Packers had, and has, at least one USDA Inspector on site at its facility in Brooklyn full-time." (Ex. 1 at ¶ 7.)

- "[E]ach of the Dairy Shakes manufactured by Trans-Packers during the period 2002-2009 was produced under the on-site supervision of USDA-Government inspectors who were present at Trans-Packers' facility, as above noted, on a full-time basis.  Prior to packaging the Dairy Shake blend, samples from each lot (one day's production) would be picked up by a USDA-certified and ISO accredited laboratory (Certified Laboratories, Inc.) for analytical testing and micro-testing (*salmonella, e. coli*, and the like) at such laboratory's facilities on Long Island, New York. . . . **all samples from all lots shipped to Wornick**" tested "**negative for salmonella**." (*Id.* at ¶ 15 (emphasis added).)[4]

- "Subsequent to such testing [by Certified Laboratories, Inc.], the Dairy Shake product would be packaged, and representative samples from the same lot would be picked up by the on-site USDA inspector and thereafter be tested by USDA at one of its own testing facilities . . ." and all of these "USDA test results for Dairy Shake blend sold to Wornick during the 2-year recall period . . . reflected (similar to the results from Certified Laboratories, Inc.) a negative finding for *salmonella*." (*Id.*)

- Thus, "all of the Dairy Shake blends sold to Wornick by Trans-Packers during the recall period June 2007-June 2009 . . . were produced under sanitary conditions, under USDA supervision and inspection, and were tested and certified as *salmonella* free by multiple sources." (*Id.* at ¶ 18.)

---

[4] Further, "[f]or several weeks" after the positive test for salmonella in Trans-Packers' Lot #9133, Trans-Packers' facilities "were exhaustively inspected and tested by FDA inspectors, primarily from the local office of the FDA in New York. The on-site USDA inspectors were present throughout this period. At least two hundred fifty (250) environmental and product samples were examined by the FDA – and all were negative." (Ex. 1 at ¶ 17.)

Mr. Weiss also stated that "to our best knowledge, and FDA bulletins, notwithstanding the many hundreds of thousands of Dairy Shake blends actually consumed by the U.S. military personnel during the 2-year period covered by the recall, no illnesses have been reported to date."  (*Id.* at ¶ 18.)  Indeed, even Wornick's customer, the U.S. Military, noted that "[t]esting and quality control protocols are stringent for operational ration components and there are no known incidents of illness from consuming the operational ration Dairyshake Powder."  (Compl. at ¶ 43 & Ex. H (attached to Compl.) at PAGEID # 53.)

### F. <u>The Policy</u>

HCC issued the Policy to Wornick on July 14, 2008 for a Policy Period covering July 10, 2008 through July 10, 2009.  (*See* Policy, attached hereto as Ex. 5, at "Declarations"; *see also* Ex. 3 at ¶ 6.) The Policy provides coverage for covered losses resulting from "Accidental Product Contamination" subject to the following limits:  1) $1,000,000 for "Recall Expenses"; 2) $1,000,000 for "Lost Gross Profit"; 3) $250,000 for "Rehabilitation Expenses"; and 4) $1,000,000 for "Crisis Response" or "Consultant" expenses.  (*Id.*)  There is a $500,000 deductible, and coverage is subject to a $1,000,000 aggregate limit per LOSS and year.  (*Id.*)

#### 1. <u>Relevant Policy Provisions</u>

Section 2 of the Policy indemnifies Wornick (and its subsidiaries), the Named Insured: "for LOSS **<u>resulting directly</u>** from an ACCIDENTAL PRODUCT CONTAMINATION first discovered by the Named Insured during the Policy Period."  (Ex. 5 at Section 2 "Scope of Coverage" (emphasis added).)

#### 2. <u>Defined Terms Under the Policy</u>

The Policy defines ACCIDENTAL PRODUCT CONTAMINATION as:

7

(1)  any accidental or unintentional **contamination**, **impairment** or mislabeling (including mislabeling of instructions for use) **during** the manufacture, blending, mixing, compounding, packaging, labeling, preparation, production or processing (or storage on the premises of the Named Insured), **of the Named Insured's PRODUCTS** (including their ingredients or components), or PUBLICITY implying such, or

(2)  fault in design specification or performance of the Named Insured's PRODUCT(S)

**provided always** that the consumption or use of the Named Insured's CONTAMINATED PRODUCT(S) has, within 120 days of such consumption or use, either resulted, or may likely result, in: (1) physical symptoms of bodily injury, sickness or disease or death of any person(s) and/or (2) physical damage to (or destruction of) tangible property, including animals and/or livestock – other than PRODUCT(S) of the Named Insured.

(*Id.* at Section 2 "Definitions" (emphasis added).)  In addition, the Policy defines several other terms as follows:

- CONTAMINATED PRODUCT(S) are "[t]he Named Insured's PRODUCT(S) which have been the subject of an ACCIDENTAL PRODUCT CONTAMINATION – excluding any in-ground crops, land and/or livestock." (*Id.*)

- PRODUCT(S) are "All goods or products (finished or in process), including all ingredients or components thereof, manufactured, distributed, handled by the Named Insured (or manufactured by a contract manufacturer for the Named Insured) and which are (or will be) available for sale by the Named Insured." (*Id.*)

- PUBLICITY is "[t]he reporting of an actual or alleged ACCIDENTAL PRODUCT CONTAMINATION during the Policy Period in local, regional or national media (including but not limited to radio, television, newspapers, magazines or the Internet) or any governmental publication where the Named Insured's PRODUCT(S) and the Named Insured are specifically named." (*Id.*)[5]

---

[5] Section 1 of the Policy ("Malicious Product Tampering") is not at issue.  Further, this Motion addresses coverage and bad faith issues, but not the accuracy, nature, or extent of Wornick's alleged damages.  Should this case proceed, Wornick would be required to prove its damages in light of the Policy's deductible and limits of liability.

### III.   LAW AND ARGUMENT

#### A.   Summary Judgment Standard

Summary judgment should be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A genuine issue of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

#### B.   Interpretation of An Insurance Policy Under Ohio Law.

Under Ohio law, "[a]n insurance policy is a contract, and its construction is interpreted as a matter of law."[6]  *Penn Traffic Co. v. AIU Ins. Co.*, 99 Ohio St. 3d 227, 229, 790 N.E.2d 1199, 1202 (2003); *see also Cincinnati Ins. Co. v. CPS Holdings, Inc.*, 115 Ohio St. 3d 306, 875 N.E.2d 31, 33 (2007).  Consequently, in interpreting an insurance policy, "the role of a court is to give effect to the intent of the parties to the agreement."  *Cincinnati Ins. Co.*, 875 N.E.2d at 33. To do this, the court examines the insurance contract "as a whole" and presumes "that the intent of the parties is reflected in the language used in the policy." *Id.* at 34; *see also Whitt Mach., Inc. v. Essex Ins. Co.*, 377 F. App'x 492, 496 (6th Cir. May 13, 2010) ("[T]he intention of the

---

[6] In a diversity action, a federal court applies the choice of law rules of the forum state. *Montgomery v. Wyeth*, 580 F.3d 455, 459 (6th Cir. 2009).  In contract disputes, absent a choice of law provision, Ohio courts apply the Restatement (Second) of the Conflict of Laws, and look at the place of contracting, negotiation, and performance as well as the location of the subject matter and the domicile, residence, nationality, place of incorporation, and place of business of the parties.  *See generally Owners Ins. Co. v. Barone*, 832 F. Supp. 2d 804, 808 (N.D. Ohio 2011) (citing *Gries Sports Enters., Inc. v. Modell*, 15 Ohio St.3d 284, 473 N.E.2d 807, 810 (1984)); *Scott v. Allstate Indem. Co.*, 417 F. Supp. 2d 929, 932 (N.D. Ohio 2006).  With regard to Wornick's claims for breach of contract and declaratory judgment, these factors point to Ohio, where Wornick has its principal place of business.  *Id.*; (Compl. at ¶ 10.)

parties must be derived . . . from the instrument as a whole, and not from detached or isolated parts thereof"). Further, the court looks "to the plain and ordinary meaning of the language used in the policy unless another meaning is clearly apparent from the contents of the policy." *Cincinnati Ins. Co.*, 875 N.E.2d at 34. When the language of the policy is clear, the court "may look no further than the writing itself to find the intent of the parties." *Id.*; *see also Miller v. Marrocco*, 28 Ohio St. 3d 438, 504 N.E.2d 67, 69 (1986) ("A court has an obligation to give plain language its ordinary meaning and to refrain from rewriting the contractual agreement of the parties."); *Retail Ventures, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 2012 WL 3608432, *3 (6th Cir. 2012).

The insured has the burden of proving a loss and demonstrating coverage under the policy. *Inland Rivers Serv. Corp. v. Hartford Fire Ins. Co.*, 20 O.O.3d 20, 418 N.E.2d 1381, 1383 (1981); *U.S. Fire Ins. Co. v. Chardon Rubber Co.*, 961 F.2d 1580 (6th Cir. Apr. 23, 1992) (table).

### C. Wornick Has Not Suffered Any Losses Resulting Directly From an ACCIDENTAL PRODUCT CONTAMINATION.

As laid out in the Policy, Wornick must show losses "resulting directly" from an ACCIDENTAL PRODUCT CONTAMINATION – a defined term that can only occur if a **certain event** ("contamination, impairment or mislabeling") occurs **during the manufacturing process** ("during the manufacture, blending, mixing, compounding, packaging, labeling, preparation, production or processing (or storage on the premises of the Named Insured)") to **certain products** ("the Named Insured's PRODUCTS (including their ingredients or components)") or, alternatively, there is **PUBLICITY** (a defined term) implying that this happened. In addition, the Policy **also requires** ("provided always") that the "consumption or

use of the Named Insured's CONTAMINATED PRODUCT(S) has . . . either resulted, or may likely result, in (1) physical symptoms of bodily injury, sickness or disease or death of any person(s) and/or (2) physical damage to (or destruction of) tangible property . . . other than PRODUCT(S) of the Named Insured."  Wornick cannot show this; consequently, it cannot meet its burden and there is no coverage under the Policy.

### 1. Salmonella Was Never Discovered On Any Of Wornick's Products.

Despite extensive testing, salmonella contamination was only discovered in two places: (1) Plainview equipment on or about June 19, 2009; and (2) dairy shake product in Trans-Packers' Lot #9133 on or about May 28, 2009.  Section 2 of the Policy, however, requires that "any accidental or unintentional contamination [or] impairment" must be "of the Named Insured's [Wornick's] PRODUCTS (including their ingredients or components)" and defines PRODUCTS as "[a]ll goods or products (finished or in process), including all ingredients or components thereof, manufactured, distributed, handled by the Named Insured (or manufactured by a contract manufacturer for the Named Insured)."

Plainview's equipment – which is neither a good nor a product – is not Wornick's PRODUCT.  Likewise, the dairy shake product contained in Lot #9133 was not Wornick's PRODUCT.   In particular, Wornick has admitted that there is no evidence "of Trans-Packers having sold to Wornick Dairy Shakes from Lot # 9133"; indeed, there is no evidence that any of the dairy shake product in Lot #9133 was manufactured for Wornick or a part of Wornick's manufacturing process.[7]  (Ex. 2 at Resp. to Admis. No. 15; *see also id.* at Nos. 13-14, 16.)[8]  This

---

[7] As Lester Weiss (Trans-Packers' Chief Operating Officer) explained, "Wornick would issue purchase orders to Trans-Packers for . . . Dairy Shake blends" and Trans-Packers would "blend (manufacture) the Dairy Shake product at its USDA and USDA Dairy-certified plant in Brooklyn, and ship the finished product to Wornick's facilities in

is not surprising, given that Trans-Packers manufactured dairy shakes not only for Wornick but also for other customers.  (*Id.* at Resp. to Admis. No. 18; Ex. 1 at ¶ 4.)

In short, salmonella contamination was never found on any of Wornick's PRODUCT(S), including any components manufactured by a contract manufacturer for Wornick.

## 2. There Was No Contamination or Impairment During the Manufacturing Process.

Not only was salmonella contamination not discovered on Wornick's PRODUCTS, but no contamination or impairment was discovered during Wornick's manufacturing process. Section 2 of the Policy specifies that "any accidental or unintentional contamination [or] impairment" must occur "**during** the manufacture, blending, mixing, compounding, packaging, labeling, preparation, production or processing (or storage on the premises of the Named Insured)."  (Ex. 5 at Section 2 "Scope of Coverage" & "Definitions" (emphasis added).)  This language is clear: contamination or impairment cannot occur before, after, or outside of the manufacturing process; rather, it must occur during the manufacturing process.

The dairy shakes Wornick claims were "contaminated" were shipped to Wornick months before the finding of salmonella contamination on Lot #9133 (May 28, 2009) and Plainview manufacturing equipment (June 19, 2009).  (Compl. at ¶¶ 45-46; *see also* Ex. 4 at HCC00683-HCC00684 (noting that the lots Wornick claims were "contaminated . . . were shipped to Wornick between 10/23/2007 to 12/02/2008. These lots were used in the MREs from 11/13/2007 to 05/19/2009.")  To illustrate:

---

Ohio . . . where such product would be combined by Wornick . . . into MRE cases . . . and shipped to DOD facilities . . . ." (Ex. 1 at ¶ 13.)  No purchase order has been provided by Wornick for Lot #9133.

[8] In fact, all of the lots that Wornick claims were "contaminated" were shipped to Wornick between 10/23/2007 and 12/02/2008 – long before the finding of contamination on Lot #9133 or Plainview manufacturing equipment.  (*See* Ex. 4 at HCC00683-HCC00684.)



(*Id.*; *see also* Ex. 2 at Resp. to Admis. No. 21 (admitting that all of the dairy shakes Wornick claims were "contaminated" or "impaired" were "supplied by Trans-Packers").)  In other words, there is no correlation between the product Wornick re-worked and the salmonella contamination found in Lot #9133 or on Plainview manufacturing equipment.

This gap underscores that there was no contamination or impairment of Wornick's products during the manufacturing process.  Instead, the finding of salmonella contamination – and the Plainview Recall that resulted in Wornick's rework – occurred after the dairy shakes that Wornick is seeking indemnification for had already been shipped to and used by Wornick (or, in other words, outside of and completely unrelated to the manufacturing process). Since it is a prerequisite to a finding of ACCIDENTAL PRODUCT CONTAMINATION that any contamination or impairment occur during the manufacturing process, there is no coverage under the Policy.

This reasoning and result parallels another case, *Caudill Seed & Warehouse Co., Inc. v. Houston Cas. Co.*, 835 F. Supp. 2d 329 (W.D. Ky. 2011), where the court construed identical policy language before determining that there had been no ACCIDENTAL PRODUCT CONTAMINATION. In *Caudill Seed*, a peanut product processor (Caudill) purchased raw peanuts from Peanut Corporation of America ("PCA") and Granola Kitchen, Inc. ("GKI"). *Id.* at 335. In January of 2009, the FDA and the Center for Disease Control and Prevention concluded that an outbreak of salmonella originated from peanut butter produced by PCA. *Id.* As a result, "PCA was required by the FDA to recall several of its products" and Caudill "was contacted by both PCA and GKI about the potential contamination of the peanuts." *Id.* Ultimately, the Department of Health and Human Services sent a letter advising Caudill that "the FDA considered Caudill's products 'to have posed an acute, life-threatening hazard to health'" and approving Caudill's "decision to pull its peanut products." *Id.* Thereafter, Caudill "worked with the FDA in the recall of its products, as well as complying with the FDA's on-site inspections." *Id.*

After recalling these products, Caudill submitted a claim for ACCIDENTAL PRODUCT CONTAMINATION under Section 2 of its Malicious Product Tampering / Accidental Product Contamination Insurance Policy. 835 F. Supp. 2d at 333-335. The case proceeded to dispositive briefing, with the parties presenting cross-motions for summary judgment to Chief Judge Joseph H. McKinley. *Id.* at 335. After reviewing the language of the Policy, however, Chief Judge McKinley concluded that "the contamination or impairment did not occur during the manufacturing process" and, consequently, that Caudill's claim was not covered. *Id.*

*Caudill Seed* shows that a recall, and the possibility of contamination, are not enough to trigger coverage under the Policy. It is not alone in this respect. *See also, e.g., Little Lady*

14

*Foods, Inc. v. Houston Cas. Co.*, 819 F. Supp. 2d 759, 762-763 (N.D. Ill. 2011) (construing identical policy language and finding the policyholder's arguments for coverage unreasonable because there was no ACCIDENTAL PRODUCT CONTAMINATION and "[t]he fact that [the policyholder] bore some costs as a result of its fear of contamination does not mean those costs are losses covered by the policy.").  It is also correct because, as Chief Judge McKinley recognized, coverage under the Policy is not triggered by a recall or the possibility of contamination. Instead, coverage is triggered by an ACCIDENTAL PRODUCT CONTAMINATION which, in turn, requires that any contamination or impairment occur during the manufacturing process.  If there is no contamination or impairment during the manufacturing process, there is no coverage.  There was none in *Caudill Seed*, and there is none here – notwithstanding the prophylactic recall that Wornick itself challenged as unnecessary.

### 3.    <u>There Is No Publicity Under the Policy.</u>

Wornick asserts five sources of PUBLICITY under the policy: (1) Plainview's June 23, 2009 Product Recall; (2) Franklin Farms' June 25, 2009 letter to Trans-Packers; (3) Trans-Packers' June 26, 2009 Product Recall; (4) ALFOODACT ("AFA") 131 (dated July 1, 2009); and (5) AFA 139 (dated August 12, 2009).  (Ex. 2 at Resp. to Interrog. No. 18; *see also* Exs. B-D, F & H, attached to Compl.)  None of these documents, however, provide a basis for coverage under Section 2 of the Policy.  In particular, documents (1)-(3) do not mention Wornick and documents (4)-(5) did not directly result in any of Wornick's claimed losses.

#### a.    <u>Three of The Documents Do Not Specifically Name Wornick – A Prerequisite for Finding PUBLICITY.</u>

Three of the documents Wornick claims are PUBLICITY do not mention Wornick: (1) Plainview's June 23, 2009 Product Recall; (2) Franklin Farms' June 25, 2009 letter to Trans-

Packers; and (3) Trans-Packers' June 26, 2009 Product Recall. (*See* Compl. at ¶¶ 35-37 & Exs. B-D (attached to Compl.).) Section 2 of the Policy requires that before a "reporting" can be considered PUBLICITY, it must "specifically name[]" both "the Named Insured's PRODUCT(S) **and the Named Insured**." (Ex. 5 at Section 2 "Definitions" (emphasis added).) Consequently, these three documents cannot be PUBLICITY under the Policy. And, even if these documents did name Wornick, Wornick's alleged losses resulted from the recall itself, not the documents discussing the recall; consequently, there are no alleged losses "resulting directly" from these documents. (Ex. 5 at Section 2 "Scope of Coverage.")

### b. Neither ALFOODACT 139 Nor ALFOODACT 131, Which Were Generated After the Claimed Loss, Provide a Basis for Coverage.

The final documents Wornick asserts as PUBLICITY – AFA 131 and AFA 139, which were distributed to the Department of Defense – do mention Wornick. (*See* Compl. at ¶¶ 39, 43 & Exs. F & H (attached to Compl.).) The expenses that Wornick is seeking to recover under the Policy, however, did not result from these documents. In particular, both AFA 131 and AFA 139, which are themselves updates to an earlier AFA (AFA 130), are directed to consumers (i.e., soldiers/end users in the Department of Defense) and instruct these end users on how to consume MREs that the U.S. Military has already determined may be contaminated with salmonella. (*Id.*)

Wornick, however, is claiming losses for MREs that it had to re-work, not for dairy shakes that these end users destroyed. With regard to the MREs that had to be reworked, AFA 131 states that "DLA [Defense Logistics Agency] controlled MRE and URG-E stocks will be reworked" and that "DSCP [Defense Supply Center Philadelphia] contracting officers will provide instructions under separate cover, to DLA Depots concerning rework of stocks on hand." (Compl. at Ex. F, PAGEID ## 45 & 48.) Likewise, AFA 139 states that "DSCP will rework

16

MRE under DLA control . . ." and "DSCP contracting officers will provide instructions, under separate cover, to DLA Depots concerning rework of stock on hand."  (Compl. at Ex. H, PAGEID ## 53 & 56.)

As this language shows, at the time the U.S. Military issued AFA 131 and AFA 139, it had already decided to demand that Wornick re-work the MREs.  It was this decision (and the Plainview Recall) – not AFA 131 and AFA 139 – that resulted in the reworking expenses that Wornick is seeking to recover under the Policy.  Thus, AFA 131 and AFA 139 were not PUBLICITY that "result[ed] directly" in a LOSS under the Policy; instead, they were tools used to notify soldiers that the dairy shakes in certain MREs should not be consumed, after the U.S. Military had already made the separate decision that Wornick would have to re-work product still under the U.S. Military's control.  In fact, both AFA 131 (July 1, 2009) and AFA 139 (August 12, 2009) were issued after the Plainview Recall, and it was the Plainview Recall, not AFA 139 or AFA 131, which led to Wornick's loss.  Since, before coverage will issue under Section 2 of the Policy, there must be a LOSS "resulting directly" from an ACCIDENTAL PRODUCT CONTAMINATION (including PUBLICITY), there is no coverage (or LOSS) based on AFA 131 or AFA 139.

### 4.     Wornick Also Fails to Meet the Policy's Final Consumption Or Use Requirement.

Finally, before there can be ACCIDENTAL PRODUCT CONTAMINATION (of any kind), the Policy requires:

> **provided always** that the consumption or use of the Named Insured's CONTAMINATED PRODUCT(S) has, within 120 days of such consumption or use, either resulted, or may likely result, in: (1) physical symptoms of bodily injury, sickness or disease or death of any person(s) and/or (2) physical damage to (or destruction of) tangible property, including animals and/or livestock – other than PRODUCT(S) of the Named Insured.

17

(Ex. 5 at Section 2 "Definitions" (emphasis added).)  In this case, there have been no physical symptoms of bodily injury, sickness or disease or death of any person.  (Ex. 2 at Resp. to Admis. No. 11.)  Further, and as explained above, none of Wornick's products were the subject of an ACCIDENTAL PRODUCT CONTAMINATION; consequently, none of Wornick's products were CONTAMINATED PRODUCT (defined as "[t]he Named Insured's PRODUCT(S) which have been the subject of an ACCIDENTAL PRODUCT CONTAMINATION . . . .").  (Ex. 5 at Section 2 "Definitions.")

Moreover, it was never "likely" that "physical symptoms of bodily injury, sickness or disease or death of any person(s)" would result from the consumption or use of the dairy shakes in Wornick's MREs.  This is shown by the fact that, despite extensive testing (and consumption) of the dairy shakes, no salmonella contamination of any kind was ever found in any of Wornick's products.  (*See, e.g.*, Section II.E., *supra*, discussing Ex. 1 at ¶¶ 7, 15, 17-18; Exs. 7-8; Ex. 2 at Resp. to Admis. Nos. 13-14, 16-17; Compl. at ¶ 43 & Ex. H (attached to Compl.).)[9]

### D.      There Is No Basis for Wornick's Claim for Bad Faith.

In its Complaint, Wornick alleges that:

> HCC engaged in bad faith with respect to Wornick by, among other things: failing to fully and properly investigate Wornick's claim, failing to properly investigate Wornick's claim, failing to apply provisions of this Policy, putting HCC's own interests ahead of Wornick's, failing to interpret the Policy in Wornick's favor and denying Wornick's favor and denying Wornick's claim without any reasonable justification in law or fact.

---

[9] Likewise, consumption or use neither did, nor was likely to result in "physical damage to (or destruction of) tangible property, including animals and/or livestock – other than PRODUCT(S) of the Named Insured."

(Compl. at ¶ 70.)    As an initial matter, there is some conflict[10] as to whether New York[11] or

Ohio[12] law applies to Wornick's bad faith claim.    Under the law of either state, however, there is

no basis for Wornick's bad faith claim.    As explained above, there is no coverage for Wornick's

claim because there are no losses "resulting directly" from an ACCIDENTAL PRODUCT

CONTAMINATION.    This determination is not only compelled by the unambiguous language

of the Policy, but also confirmed by the reasoning of other cases that have construed this Policy.

*See, e.g.*, *Caudill Seed*, 835 F. Supp. 2d at 335; *Little Lady Foods, Inc.*, 819 F. Supp. 2d at 762-

---

[10] In a diversity action, a federal court applies the choice of law rules of the forum state. *Montgomery*, 580 F.3d at 459.  Under Ohio law, a cause of action is classified as one arising in tort or contract and analyzed under the appropriate choice of law principles.  *Ohayon v. Safeco Ins. Co. of Illinois*, 91 Ohio St. 3d 474, 747 N.E.2d 206, 208-209 (2001). A claim for bad faith in the insurance context arises in tort.  *Hoskins v. Aetna Life Ins. Co.*, 6 Ohio St.3d 272, 452 N.E.2d 1315, 1316 (1983); *Wolfe v. Cont'l Cas. Co.*, 647 F.2d 705, 710 (6th Cir. 1981); *In re Commercial Money Ctr., Inc., Equip. Lease Litig.*, 603 F. Supp. 2d 1095, 1103, 1107-08 (N.D. Ohio 2009).  For a tort action, there is a presumption that the law of the place of the injury controls, unless another jurisdiction has a more significant relationship based on multiple factors, including the place where the conduct causing the injury occurred.  *Morgan v. Biro Mfg. Co.,* 15 Ohio St.3d 339, 474 N.E.2d 286, 288-289 (1984); *see also* RESTATEMENT (SECOND) OF CONFLICT OF LAWS, §§ 145, 146 & 6 (providing additional factors).  While any alleged injury presumably occurred in Ohio, the claim process was overseen by HCC out of its New York office and analyzed by coverage counsel based in New York.  Wornick's representative throughout the process was, in turn, based in New Jersey.  Given HCC and counsel's central role with regard to Wornick's bad faith claim, New York law should apply in the event of a dispute.

[11] New York does not recognize an independent tort cause of action for an insurer's bad faith avoidance of a valid insurance claim. *See New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 662 N.E.2d 763 (1995); *Roconova v. Equitable Life Assurance Soc'y*, 83 N.Y.2d 603, 634 N.E.2d 940 (1994); *see also Acquista v. N.Y. Life Ins. Co.*, 730 N.Y.S.2d 272, 278 (1st Dept.2001) ("We are unwilling to adopt the widely-accepted tort cause of action for 'bad faith' in the context of a first-party claim, because we recognize that to do so would constitute an extreme change in the law of this State.").  Egregious conduct on the part of the insurer, however, may support a claim of tort **independent of the insurance contract** (e.g. fraud, tortious breach of a duty of care separate and apart from the failure to fulfill its insurance obligation).  *New York Univ.*, 662 N.E.2d at 766-768, 770; *see also Cont'l Info. Sys. Corp. v. Fed. Ins. Co.*, 2003 WL 145561 (S.D.N.Y. Jan. 17, 2003)

[12] Under Ohio law, an insurer has a duty to act in good faith in the handling and payment of claims by its insured, and a breach of this duty gives rise to a cause of action in tort against the insurer.  *Hoskins*, 452 N.E.2d at 1316. "An insurer fails to exercise good faith in the processing of a claim of its insured where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor."    *Zoppo v. Homestead Ins. Co.*, 71 Ohio St.3d 552, 644 N.E.2d 397, 397 (1994).  An insurer lacks reasonable justification if it denies an insured's claim in an arbitrary and capricious manner. *Hoskins*, 452 N.E.2d at 1320; *Thomas v. Allstate Ins. Co.*, 974 F.2d 706, 711 (6th Cir. 1992). However, "'[m]ere refusal to pay insurance is not, in itself, conclusive of bad faith,'" *Retail Ventures, Inc.*, 2012 WL 3608432 at \*11 (citations omitted), and denial of a claim is justified when "the claim was fairly debatable and the refusal was premised on either the status of the law at the time of the denial or the facts that gave rise to the claim." *Tokles & Sons, Inc. v. Midwestern Indemn. Co.*, 65 Ohio St.3d 621, 605 N.E.2d 936, 943 (1992).

763.  Absent coverage, there can be no claim for bad faith.  *Retail Ventures, Inc.*, 2012 WL 3608432 at *11; *see also New York Univ.*, 662 N.E.2d at 767-770.  Moreover, there is no evidence that HCC failed to fully and properly investigate Wornick's claim.  Thus, there is no basis for Wornick's bad faith claim.

## IV.  <u>CONCLUSION</u>

Wornick's Complaint contains three counts: (1) "Count I – Declaratory Judgment"; (2) "Count II – Breach of Contract"; and (3) "Count III – Bad Faith."  Since Wornick's alleged losses resulted from a recall and not an ACCIDENTAL PRODUCT CONTAMINATION, and since there is no basis for Wornick's bad faith claim, Defendant Houston Casualty Company respectfully requests that, pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, the Court grant it summary judgment denying Wornick's claims for breach of contract and bad faith and, further, declare that there is no coverage afforded to Wornick under the Policy.

Respectfully submitted,

*s/ Kevin M. Young*
Kevin M. Young (0029715)
Karl A. Bekeny (0075332)
Jesse W. Thomas (0085253)
TUCKER ELLIS LLP
925 Euclid Avenue, Suite 1150
Cleveland, OH 44115-1414
Telephone:   216.592.5000
Facsimile:    216.592.5009
E-mail:        kevin.young@tuckerellis.com
                   karl.bekeny@tuckerellis.com
                   jesse.thomas@tuckerellis.com

*Attorneys for Defendant*
*Houston Casualty Company*

1536730