IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| THE WORNICK COMPANY,<br><br>                    Plaintiff,<br><br>vs.<br><br>HOUSTON CASUALTY COMPANY<br><br>                    Defendant. | CASE No. 1:11-CV-391-SJD<br><br>CHIEF JUDGE SUSAN J. DLOTT |

**THE WORNICK COMPANY'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT HOUSTON CASUALTY COMPANY'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiff, The Wornick Company ("Wornick"), hereby submits this memorandum of law in opposition to the Motion for Summary Judgment of Defendant, Houston Casualty Company ("HCC"). For the reasons set forth below, Wornick respectfully requests that the Court deny HCC's motion as to all counts of Wornick's complaint.

## INTRODUCTION

Wornick suffered an "Accidental Product Contamination" in the form of publicity, impairment, and contamination. To avoid making good on the insurance coverage it sold to Wornick, HCC proposes a laundry list of arguments in support of its motion, many of which HCC's own witnesses have discredited, others of which are unsupportable in light of the Policy's language, and still others of which have no bearing on coverage.[1]

HCC never defined the terms "contamination" or "impairment," and now takes advantage of its decision to leave them undefined to interpret them in a way to deny coverage.[2] Wornick is entitled to read the Policy in a reasonable manner in order to effectuate coverage. The Policy – contrary to HCC's arguments – covers Wornick's MREs and its "ingredients or components." As a result of the salmonella contamination incident, Wornick's MREs suffered an impairment, becoming diminished in value and quality and less likely to be sold or consumed. Wornick's MREs also became contaminated in that they contained Dairy Shakes made with non-fat dry milk subject to recall.

---

[1] Defined terms herein have the same meaning as in Wornick's Motion for Partial Summary Judgment [D.E. 22].

[2] HCC is no stranger to coverage denials and litigation under the Accidental Product Contamination / Malicious Product Tampering policy. See Caudill Seed & Warehouse Co., Inc. v. Houston Casualty Co., C.A. No. 3:10-cv-299 (W.D. Ky.), Hot Stuff Foods, LLC v. Houston Casualty Co., C.A. No. 4:11-cv-4055 (D.S.D.), Little Lady Foods, Inc. v. Houston Casualty Co., C.A. No. 1:10-cv-8280 (N.D. Ill.), Dickinson Frozen Foods, Inc. v. Houston Casualty Co., C.A. No. 1:2010CV300 (D. Idaho); see also Ex. K to SOF at 115-25 (explaining the reasons for HCC's coverage denial in the aforementioned cases).

In addition to impairment and contamination coverage, publicity coverage has been triggered. Three governmental reports published prior to the MRE rework and naming Wornick and its MREs resulted in Wornick's loss. HCC knew that publicity coverage was triggered – its loss adjuster noted as much – but ignored it.

The Court should likewise deny HCC's motion to escape Wornick's bad faith claim. HCC purposely left undefined critical terms, namely "impairment" and "contamination," in the Policy and in its denial letters. Even during this litigation, HCC could not define these terms when asked to do so. HCC admits that it did not focus on whether coverage existed for impairment, even though impairment constitutes a separate ground for coverage under the Policy. Under these circumstances, HCC did not have (and could not have had) a reasonable justification for its refusal to pay Wornick's claim.

In summary, HCC has not met its burden of demonstrating that it is entitled to judgment as a matter of law. At the very least, issues of material fact preclude the entry of summary judgment and the Court should deny HCC's motion.

## FACTS

Wornick incorporates by reference herein its statement of facts in support of its motion for partial summary judgment. See D.E. 22-1. Wornick addresses here only certain misstatements of fact by HCC.

Although titled a Malicious Product Tampering/Accidental Product Contamination Policy, the Policy does indemnify for recall expenses. See Ex. A to Wornick's Proposed Statement of Undisputed Facts ("SOF") at 4 (defining ""loss" to include "[a]ny reasonable expenses necessarily incurred by the Named Insured in the procedure of recall….") HCC's statement that "[t]he Policy does not cover losses resulting . . . from a recall . . ." is

entirely inaccurate and not, as it proposes, an appropriate reason for the denial of coverage. See HCC Mem. at 1.

HCC selectively quotes from an email to suggest that Wornick voluntarily reworked the MREs as a "Customer Service function." HCC Mem. at 3-4, n.3. To the contrary, the Government ***required*** Wornick to rework the MREs in that Wornick would bear the cost of the rework whether it or some other entity performed the work. SOF ¶¶ 54-55. Wornick chose to rework the MREs itself because it could so more cost effectively. Ex. 7 to HCC's Mot. for Summ. J. [D.E. 20-3] (where Wornick's Chief Financial Officer stated that one "reason we wanted to perform the work ourselves is that we felt we could do it cheaper....").

Although relevant only to the issue of damages, and not to the existence of coverage, HCC points out that Wornick reworked a small amount of Dairy Shakes that were not part of Trans-Packers' recall. This occurred because Wornick reworked all Wornick MRE production lots that included the recalled Dairy Shakes, and some of these production lots also included other Dairy Shakes. There is not a one-to-one ratio between "Wornick lots" and "Trans-Packers lots."

Finally, contrary to HCC's assertions, Wornick put HCC on notice after the Plainview Recall on or about June 24, 2009, but did not make a formal claim under the Policy until the Government insisted that it bear the costs of the rework and after Trans-Packers refused to indemnify it. Ex. CC to Wornick's Response to HCC's Statement of Proposed Undisputed Facts; Ex. L to SOF at 54:19-23, 82:2-25.

3

## ANALYSIS

### I. THE COURT SHOULD DENY HCC'S MOTION FOR SUMMARY JUDGMENT AS TO WORNICK'S BREACH OF CONTRACT AND DECLARATORY JUDGMENT COUNTS

#### A. The Impairment of Wornick's MREs Triggered Coverage Under The Policy

As part of the coverage afforded under the Policy, Wornick bought impairment coverage. The Policy does not define the term "impairment," and when asked numerous times to define it, HCC admitted <u>it did not know</u> what the term meant. Ex. M to SOF at 67:3-5, 12-16; 72:17-19; 78:14-17; 104:15-18; Ex. K to SOF at 57:2-10, 14-15; Ex. L to SOF at 119:20-23. The court should, therefore, give the term its plain and ordinary meaning and construe it in Wornick's favor. <u>Chubb Custom Ins. Co. v. Grange Mut. Cas. Co.</u>, No. 2:07-CV-1285, 2011 WL 4543896, at *7 (S.D. Ohio Sept. 29, 2011); <u>McGuire v. Nationwide Ins. Co.</u>, No. 415, 1988 WL 130699, at *3 (Ohio Ct. App. Dec. 7, 1988). Impairment consists of "[t]he fact or state of being damaged, weakened, or diminished," and "to impair" means "[t]o cause to diminish, as in strength, value, or quality." <u>Black's Law Dictionary</u> at 754; http://www.thefreedictionary.com/impairment. Wornick's MREs were impaired as a result of the contamination incident because the MREs' value and quality were diminished. HCC's corporate designee admitted that the MREs were less likely to be consumed:

> Q. You made the comment that nobody would want to receive such a shake that was returned from the government. Why do you think that's true?
>
> A. I would imagine nobody would want to receive it because of some potential for it being adulterated. I mean, that was the "Do Not Consume" indication.
>
> Q. There was a stigma on those shakes.
>
> A. If that's the word you want to use, yes....

4

Ex. K to SOF at 102:5-16. HCC's adjuster similarly indicated that the MREs were diminished in value and quality:

> Q. And once the government re-called them, not only couldn't they be used, Wornick couldn't actually sell them, correct?
>
> A. Without getting regulatory approval, they couldn't do anything with them.
>
> ...
>
> Q. You wouldn't have bought them, would you?
>
> A. No.

Ex. L to SOF at 179:4-8; 180:15-17. Because Wornick has demonstrated "impairment" under the Policy, and HCC has not met its burden of demonstrating that it is entitled to judgment as a matter of law, HCC's motion for summary judgment should be denied.[3]

### B. The Contamination Of Wornick's MREs, Including Its Component Dairy Shakes, Triggered Coverage Under The Policy

HCC's arguments aside, the contamination of the Dairy Shakes in Wornick's MREs triggered coverage under the Policy. The Policy specifically covers "contamination ... [or] impairment ... of the Named Insured's PRODUCTS *(including their ingredients or components)*." SOF ¶ 6. The Dairy Shakes undisputedly constitute a component of Wornick's MREs. HCC's corporate designee conceded as much at his deposition:

> Q: Would it be fair to say that the Dairyshake is a component of the insured's product?
>
> A: It makes up part of the product. It's contained within the package.
>
> ...

---

[3] In spite of HCC's passing suggestions to the contrary, neither the definition of "Accidental Product Contamination," nor the use of the word "impairment" therein even suggests that proof of contamination is necessary for impairment coverage.

5

nydocs1-997069

> Q: The policy uses the word "component." Is it fair to say that [the] Dairyshake is the component of the MRE?
>
> A: If you want to say it that way.
>
> Q: Would that be right?
>
> A: It's part of. If you want to use the word "component," by all means.

Ex. K to SOF at 73:11-15; 76:15-21.

Moreover, the Policy defines "PRODUCT(S)" to include "[a]ll goods or products (finished or in process), including all ingredients or components thereof, manufactured, ***distributed, handled by the Named Insured (or manufactured by a contract manufacturer for the Named Insured)*** and which are (or will be) available for sale by the Named Insured." SOF ¶ 7. The Dairy Shakes constitute the "Named Insured's PRODUCT(S)," as defined in the Policy, because (1) the Dairy Shakes are a component of Wornick's MREs; (2) Wornick, the Named Insured, distributed and handled the Dairy Shakes; (3) Trans-Packers manufactured the Dairy Shakes for Wornick pursuant to a contract; and (4) Wornick makes the MREs available for sale.

Finally, HCC inappropriately pins its coverage denial on a lack of positive salmonella test in the Dairy Shakes that Wornick retrieved from the Government and reworked. However, the Policy neither defines "contamination," nor sets forth any testing requirement. Moreover, HCC itself has not even been able to define "contamination." Ex. L to SOF at 121:24-25; 122:1-2. The dictionary defines "contamination" as "a process of contaminating" and "contaminating" as "to soil, stain, corrupt, or infect by contact or association." Merriam Webster's Collegiate Dictionary at 249. Here, the MREs were corrupted by association. Specifically, they were contaminated because they contained Dairy Shakes that were (1) ordered not be consumed and (2) made with NFDM that was subject to recall. Each of the lots of MREs

6

that the Government required Wornick to retrieve are traceable to Dairy Shakes made with recalled NFDM. SOF at ¶¶ 106-107. Accordingly, the Policy's contamination coverage was triggered and HCC's motion for summary judgment should be denied. Alternatively, issues of material fact – including whether Wornick's product was contaminated – preclude the entry of summary judgment in HCC's favor.[4]

### C. A Contamination Or Impairment Of Wornick's MREs Occurred During Manufacturing And Production

Contamination of Wornick's MREs occurred during the manufacturing and production process. It was during manufacturing and production that Dairy Shakes containing recalled NFDM were incorporated into Wornick's MREs, causing the MREs to become a contaminated product. That the recalled Dairy Shakes were shipped to Wornick before the discovery of salmonella in Lot No. 9133 and on Plainview's equipment does not indicate anything about the time of contamination of Wornick's MREs. Moreover, that the shipment of the recalled Dairy Shakes pre-dated the positive salmonella tests does not mean that the recalled Dairy Shakes were not contaminated.

Similarly, impairment of Wornick's MREs also occurred during the manufacturing and production process. It was during this process that the recalled Dairy Shakes were incorporated into Wornick's MREs, thereby diminishing their value and quality. From the moment that Wornick's MREs contained this recalled product, they were less likely to be sold or consumed.

---

[4] To the extent that contamination coverage necessitates a positive salmonella test, Wornick is entitled to contamination coverage based on Lot No. 9133 of Dairy Shakes, which indisputably tested positive for salmonella. The Dairy Shakes are a "component" product of the MRES, even when still "in process." See SOF ¶ 7 (defining "PRODUCT(S)" as ""[a]ll goods or products (finished *or in process*), including all ingredients or *components* thereof, manufactured, *distributed, handled by the Named Insured (or manufactured by a contract manufacturer for the Named Insured)* and which are *(or will be)* available for sale by the Named Insured") (emphasis added).

Caudill Seed & Warehouse Co. v. Houston Casualty Co. ("Caudill"), upon which HCC relies, is neither controlling nor persuasive. 835 F. Supp. 2d 329 (W.D. Ky. 2011). The Caudill Court pinned its decision on the fact that the "source of the contamination or impairment did not occur at Plaintiff's facilities" and that "[t]he peanuts were contaminated or impaired prior to Plaintiff obtaining them." Id. at 336. Here, the operative product is Wornick's MREs, which were not contaminated or impaired until they incorporated the Dairy Shakes. The contamination and impairment, therefore, did occur during the manufacturing and production process.[5]

Little Lady Foods, Inc. v. Houston Casualty Co. ("Little Lady") is similarly inapplicable because it is factually distinguishable. 819 F. Supp. 2d 759 (N.D. Ill. 2011). In Little Lady, the product tested negative for the only type of listeria likely to cause physical symptoms of bodily injury, sickness, disease or death in humans; the USDA released the product from hold; and some of the product was sold on the secondary market for consumption. Id. at 761. Here, HCC has pointed to no negative test results for the retrieved and reworked MREs, the MREs were not simply placed on hold but had to be retrieved and reworked, and none of the MREs were sold.

### D. The Government Published Reports Implying Contamination and Impairment of the MREs, Resulting Directly In A Loss Under the Policy, and Triggering the Policy's Publicity Coverage

At the very least, the Government published three reports "implying" or "alleging" contamination and impairment of the MREs, entitling Wornick to reimbursement of

---

[5] If HCC is correct that the actual contamination must occur at the plant itself, the coverage sold to a company like Wornick would be illusory – or at very least – extremely limited. Much of the MRE is made elsewhere.

8

its "losses" under the Policy: ALFOODACT 131-2009, ALFOODACT 139-2009, and a DLA Report updated September 30, 2009.[6]

### *1.  ALFOODACT 131-2009 constitutes "publicity" under the Policy, resulting directly in a loss.*

ALFOODACT 131-2009 triggers the Policy's publicity coverage. It is a "report" because it gives a "detailed account or statement." See Merriam Webster's Collegiate Dictionary at 992 (defining "report" as "a usually detailed account or statement"). ALFOODACT 131-2009 implies that the MREs were contaminated or – at very least – impaired. It refers to "adulterated dairyshake," "affected rations," "the extensive nature of the potential adulteration," "[p]otentially adulterated with Salmonella" and "the DO NOT CONSUME ORDER." SOF ¶¶ 31, 34. It orders the recipient: "DO NOT CONSUME ... Dairyshake Powder ... found in the affected rations," and "remove and destroy ... dairyshake powder until the potentially adulterated stocks are exhausted" and "to ensure it will not be accidentally consumed." Id. at ¶¶ 31-32. The aforementioned references, admonitions, and orders *allege* and certainly *imply* that the MREs are contaminated with salmonella and/or impaired in that they are less likely to be sold or consumed.

ALFOODACT 131-2009 was published on the internet, and in any event, constitutes a "governmental publication" as the DSCP released it. Id. at ¶ 35. Finally, it names the MRE as an "affected product" and Wornick as a "ration assembler." Id. at ¶ 33.

As a result of ALFOODACT 131-2009, which was published on July 1, 2009, and which required the destruction and replacement of certain Dairy Shakes, Wornick reworked 700,000 cases of MREs between December of 2009 and June of 2010. Wornick, therefore,

---

[6] While Plainview's June 23, 2009 recall, Franklin Farm's June 25, 2009 recall, and Trans-Packers' recall do not specifically name Wornick, the Policy does not state that this "identification requirement" applies to non-governmental publications. In any event, ALFOODACTs 131-2009 and 139-2009 and the DLA Report all specifically name Wornick.

9

sustained a "loss resulting directly from an accidental product contamination" in the form of publicity. HCC's position dismissing the ALFOODACTs pushes the bounds of "reasonableness," especially considering that HCC's underwriter admitted that ALFOODACT 131-2009 "could be" publicity. Id. at ¶ 36.

### 2. *ALFOODACT 139-2009 constitutes "publicity" under the Policy, resulting directly in a loss.*

ALFOODACT 139-2009 also triggers the Policy's publicity coverage. ALFOODACT 139-2009 specifically calls out Wornick and the Wornick MREs. It provides a "detailed account or statement" and thus fits the plain meaning of the term "report." Furthermore, ALFOODACT 139-2009 alleges "contamination" and "impairment." Specifically, the Government orders: "Do Not Consume MRE and UGR-E Dairy Shake powder." The Government further instructs: "[c]onsumers/end users should remove and destroy the Dairyshake Powder in a manner to ensure it will not be accidentally consumed" and "the intermittent nature of potential adulteration makes it prudent to expand the recall period and provide our war fighters and other customers with only safe and wholesome products." The ALFOODACT uses phrases such as: "[p]otentially adulterated with Salmonella sp." and "the affected rations." These statements and phrases at very least "imply" – if not state outright – that the MREs are ***contaminated*** with salmonella or impaired in that they are less likely to be consumed or sold.

ALFOODACT 139-2009 was published on the internet and constitutes a "governmental publication" because it was released by DSCP. Published on August 12, 2009, it caused a "loss resulting directly from an accidental product contamination" because it required Wornick to incur nearly $2,800,000 in costs to rework the MREs between December of 2009 and June of 2010. ALFOODACT 139-2009 thus constitutes publicity under the Policy.

10

### 3. *The DLA Report updated September 30, 2009 constitutes "publicity" under the Policy resulting directly in a loss.*

In addition to the ALFOODACTs, the DLA article triggers publicity coverage. It is a report because it consists of a "detailed account or statement." The DLA article reports an actual, alleged, or implied contamination or impairment of the MREs and unequivocally implies contamination or impairment. See id. at ¶ 6 (defining "Accidental Product Contamination" to include "contamination" or "impairment"). To that end, the DLA article states that: (1) Plainview made NFDM using equipment found to contain salmonella, and that NFDM, in turn, was used to produce Dairy Shakes assembled in MREs; and (2) "DSCP issued ALFOODACT 130-2009 to ensure no Dairyshakes would be consumed." Id. at ¶ 49. It also refers to "the extensive nature of potential adulteration," the expansion of the Plainview recall "to ensure the safety of war fighters around the world," and the need to "provide our war fighters and other customers with only safe and wholesome products." Id. The aforementioned statements report an actual, alleged, or implied contamination or impairment of the MREs.

The DLA Report qualifies as internet media or a governmental publication since DLA, an arm of the government, published it on the internet. Id. at ¶ 49. Finally, the DLA Report specifically names Wornick, the Named Insured, as well as the MREs, the Named Insured's product. Id. at ¶ 50.

HCC's own loss adjuster, Michael Tocicki, recognized that the DLA Report constituted "publicity" under the Policy. See id. at ¶ 71. In fact, Tocicki he wrote that "[b]ased upon preliminary inquiries it appears possible that an Accidental Product Contamination, as defined, has occurred (due to the Publicity clause)." Id. Wornick sustained a covered loss as a result of this publicity because the Government required it to rework the affected MREs subsequent to the publication of this report, between December of 2009 and June of 2010. HCC

11

has not met its burden of demonstrating that it is entitled to judgment as a matter of law. Its motion for summary judgment should therefore be denied.

### E. The Manifestation Period Requirement Has Been Met

It is undisputed – contrary to HCC's eleventh hour arguments to the contrary – that the consumption of MREs contaminated with salmonella may likely result in "physical symptoms of bodily injury, sickness or disease or death." Explaining this "manifestation period" requirement, HCC's underwriter testified: "the contamination or impairment or whatever it is has to be of such a nature that if you were to consume the product, you would or may likely become ill within 120 days of having consumed it." Ex. M to SOF at 62:10-16. Surprisingly, HCC argues that salmonella contamination would not satisfy this requirement, even though at deposition, HCC's underwriter conceded that the requirement was met:

> Q: And wasn't there a potential health hazard with regard to the Wornick MREs?
>
> A: There was a potential health hazard by virtue of that letter that came from Plainview.

Id. at 64:9-14.

Furthermore, a Class 1 Recall, *__as was put into effect here__*, by definition, implies this potential for sickness. As HCC's loss adjuster testified:

> Q: What does a Class 1 or Class 2 re-call indicate to you with respect to these policy forms?
>
> ...
>
> A: From my experience, if there's a Class 1 re-call that's almost an automatic coverage trigger.
>
> Q: Why is that?
>
> A: USDA and FDA ... say the product has potential for bodily harm or potential for illness.
>
> Q: So a Class 1 re-call would bear on our coverage recommendation determination, is that fair to say?

A:    Most of the time, yes.

Ex. L to SOF at 46:17-25; 47:1-8. See also SOF ¶ 30 (defining Class 1 Recall as "a situation in which there is a reasonable probability that the use of or exposure to a violative product will cause serious adverse health consequences or death").

That "there have been no reported instances of bodily injury, sickness, disease, or death that resulted from the consumption or use of Wornick's products" is of no significance. First, the retrieval and rework ensured that this would not happen. Second, the Policy does not require that people get sick, only that consumption of the product ***"may likely result"*** in symptoms of bodily injury, sickness, disease or death. Because salmonella contamination may likely result in such symptoms, the manifestation period requirement is met and HCC's summary judgment motion must be denied.

## II.    THE COURT SHOULD DENY HCC'S MOTION FOR SUMMARY JUDGMENT AS TO WORNICK'S BAD FAITH CLAIM

### A.    Ohio, And Not New York Law, Applies To This Dispute

Ohio law applies to this dispute in its entirety. To determine the law to apply in an insurance coverage case, Ohio courts look to the Restatement (Second) of the Conflicts of Laws and consider the following factors: the (1) place of contracting; (2) place of negotiation; (3) place of performance; (4) location of the subject matter; and (5) parties' domicile, residence, nationality, place of incorporation, and place of business. Owners Ins. Co. v. Barone, 832 F. Supp. 2d 804, 808 (N.D. Ohio 2011); Scott v. Allstate Indem. Co., 417 F. Supp. 2d 929, 932 (N.D. Ohio 2006).

Application of these factors demonstrates that Ohio law applies to this case. Wornick is incorporated in Delaware and has its principal place of business in Ohio. HCC is incorporated and has its principal place of business in Texas. It is undisputed that Wornick's

13

insurance agent – Marsh USA – is located in New Jersey. HCC's Mem. at 19, n.10. The insurance contract was made and negotiated – at least in part – in Ohio. Furthermore, Wornick sustained losses in Ohio, where it is based, and from where it was required to expend funds to retrieve and rework the MREs. Wornick looked to HCC to perform under the Policy, i.e., indemnify Wornick for its losses, in Ohio. On balance, Ohio has the most ties to this dispute and its law should apply.

HCC's contention that New York law applies to Wornick's bad faith count is simply unfounded and transparent. Even if bad faith in the insurance context sounds in tort and the place of injury controls, as HCC contends, Wornick was injured in Ohio, where it sustained losses, where it runs its business, and where HCC failed to indemnify it for its losses. The fact that HCC hired a New York attorney to deny coverage on its behalf is fortuitous and does not make the place of Wornick's injury New York.

### B. Under Ohio Law, Issues Of Material Fact Exist Concerning Whether HCC Acted In Bad Faith In Handling Wornick's Insurance Claim

Issues of material fact concerning HCC's bad faith in handling Wornick's insurance claim preclude the entry of summary judgment as to Count III in Wornick's complaint. An insurance company "has the duty to act in good faith in the handling and payment of [its policyholder's] claims." Hoskins v. Aetna Life Ins. Co., 6 Ohio St. 3d 272, 276, 452 N.E.2d 1315, 1319 (1983). This duty of good faith includes an affirmative duty to conduct an adequate investigation. Zoppo v. Homestead Ins. Co., 71 Ohio St. 3d 552, 558, 644 N.E.2d 397, 402 (1994). An insurance company processes a policyholder's claim in bad faith "where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor." Id. at 554, 644 N.E.2d at 400. An insurance company lacks reasonable justification for denying a claim when its refusal to pay is predicated on an arbitrary or capricious belief that

14

the policyholder is not entitled to coverage. See Hoskins, 6 Ohio St.3d at 277, 452 N.E.2d 1320. In this case, HCC acted in bad faith by, inter alia, failing to: (1) adequately investigate coverage; (2) pay Wornick's claim without reasonable justification; and (3) apply and give meaning to the Policy's provisions.

HCC denied Wornick's claim for impairment coverage without any reasonable justification. During their depositions, HCC's corporate designee, loss adjuster, and underwriter could not define the term "impairment." Ex. M to SOF at 67:3-5, 12-16; 72:17-19; 78:14-17; 104:15-18; Ex. K to SOF at 57:2-10, 14-15; Ex. L to SOF at 119:20-23. Without defining the term in any of its denial letters, HCC denied coverage for Wornick's claim. SOF ¶¶ 82, 91-92, 104. Moreover, HCC's corporate designee and loss adjuster admitted that they did not focus on impairment as a basis for coverage in this case. Ex. K to SOF at 59:5-6; Ex. L to SOF at 122:8-9. HCC's failure to consider adequately the possibility of impairment coverage is evident in WEMED's denial letters, which address this coverage only fleetingly, without defining its scope or explaining why it is not triggered. SOF ¶¶ 82, 91-93.[7]

Similarly, HCC denied publicity coverage without any reasonable justification. It denied such coverage after its outside loss adjuster suggested that publicity coverage might be triggered. Id. at ¶¶ 71-73. Additionally, HCC failed to address the ALFOODACTs in its denial letters as a basis for publicity even though HCC's loss adjuster brought them to HCC's attention in his second report. Id. at ¶¶ 94, 98-101, 104. HCC's failure to consider the possibility of impairment coverage – and its unjustified and unexplained denial of publicity coverage – constitute a failure to apply the Policy's provisions and resulted in a denial of Wornick's claim

---

[7] HCC similarly denied coverage for contamination even though the Policy does not define "contamination." HCC's witnesses were not able to define that term at deposition either. See, e.g., Ex. L to SOF at 121:24-25, 122:1-2.

15

without reasonable justification. In the least, they raise issues of material fact about HCC's bad faith, precluding the entry of summary judgment in HCC's favor.

## CONCLUSION

For the aforementioned reasons, the Court should deny HCC's Motion for Summary Judgment.

Dated: October 19, 2012

By: /s/ Gregory A. Harrison

Gregory A. Harrison, Bar No. 0029814
DINSMORE & SHOHL LLP
1900 Chemed Center
255 East Fifth Street
Suite 1900
Cincinnati, OH 45202
T: 513-977-8200
F: 513-977-8141
greg.harrison@dinsmore.com

Steven J. Pudell (admitted pro hac vice)
ANDERSON KILL & OLICK, P.C.
One Gateway Center
Suite 1510
Newark, NJ 07102
T: 973-642-5858
F: 973-621-6361
spudell@andersonkill.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 19, 2012, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the below-listed trial counsel:

>Kevin M. Young
>Karl A. Bekeny
>Jesse W. Thomas
>TUCKER ELLIS & WEST LLP
>925 Euclid Avenue, Suite 1150
>Cleveland, OH 44115-1414

/s/ Gregory A. Harrison

Gregory A. Harrison
DINSMORE & SHOHL LLP
1900 Chemed Center
255 East Fifth Street, Suite 1900
Cincinnati, OH 45202
P: 513-977-8314
F: 513-977-8141

nydocs1-997069