IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN  DIVISION

| | |
|---|---|
| THE WORNICK COMPANY, | ) CASE NO. 1:11-CV-391-SJD |
| Plaintiff, | ) |
| | ) CHIEF JUDGE SUSAN J. DLOTT |
| v. | ) |
| | ) **DEFENDANT HOUSTON CASUALTY** |
| HOUSTON CASUALTY COMPANY, | ) **COMPANY'S OPPOSITION TO** |
| | ) **PLAINTIFF'S MOTION FOR** |
| Defendant. | ) **SUMMARY JUDGMENT** |
| | ) |

## I.      <u>INTRODUCTION</u>

Plaintiff The Wornick Company's ("Wornick") Motion for Summary Judgment suffers from the same flaw that characterized its arguments throughout the claim process: it refuses to read the "Malicious Product Tampering / Accidental Product Contamination" Policy (the "Policy") as a whole and, instead, focuses on detached or isolated parts.  Wornick's attempt to rewrite the Policy is no surprise, because Wornick's alleged losses resulted from a recall – not an accidental product contamination.  To obtain coverage, Wornick must transform the accidental product contamination policy (that it purchased) into a recall policy (that it did not purchase).  Wornick's attempt at a rewrite must fail, however, because it bears the burden of showing that it meets all of the Policy's requirements, which it cannot do simply by disregarding the language it does not like.  Since Wornick cannot meet its burden, there is no coverage and, accordingly, Defendant Houston Casualty Company ("HCC") asks the Court to deny Wornick's request for summary judgment for breach of contract (Count II) and to issue a declaration (Count I) that Wornick is not entitled to coverage.

## II.   FACTUAL BACKGROUND

### A.   Wornick Does Not Dispute The Facts Provided in Support of HCC's Motion for Summary Judgment and Found in the Statement of Proposed Undisputed Facts.

HCC incorporates the Factual Background section of its Motion for Summary Judgment and its Statement of Undisputed Facts as if fully rewritten herein.  (Doc. 20-1 at PAGEID#:140-146; Doc. 20-2.)  In its Factual Background, HCC discussed in detail the material facts relevant to this coverage dispute.  (*Id.*)  These same facts formed HCC's Proposed Undisputed Facts ("HCC UF").  (*Id.*)  While all of HCC's Proposed Undisputed Facts are important to resolving this coverage dispute, several merit particular attention:

1.   There have only been two findings of salmonella contamination: (1) in Lot #9133 at Trans-Packers on or about May 28, 2009; and (2) on Plainview equipment on or about June 19, 2009.  (Doc. 20-2, HCC UF No. 21; *see also* Doc. 22-1, Wornick UF Nos. 16-17.)

2.   None of the dairy shake product in Lot #9133 was sold to Wornick, which is only one of Trans-Packers' customers.  (Doc. 20-2, HCC UF No. 22.)

3.   In other words, no product that tested positive for salmonella was purchased by Wornick or part of Wornick's manufacturing process. (*Id.* at HCC UF Nos. 21-24.)

4.   Instead, the dairy shakes Wornick claims were "contaminated" were shipped to Wornick between 10/23/2007 and 12/02/2008 and used in MREs between 11/13/2007 and 05/19/2009.  (*Id.* at HCC UF No. 16.)

5.   After salmonella was found on its equipment, Plainview issued a voluntary recall on June 23, 2009.  (*Id.* at HCC UF No. 10.)

6.   After the Plainview Recall, Wornick's customer, the U.S. Military, demanded that Wornick assume all costs for recalling and reworking approximately 700,000 MREs, which the U.S. Military had already purchased and received from Wornick.  (*See id.* at HCC UF No. 14.) Wornick complied with this demand.  (*Id.* at HCC UF No. 15)

2

7. The dairy shakes Wornick assembled and reworked for its customer, the U.S. Military were subject to extensive, stringent testing, and none of these dairy shakes has tested positive for salmonella contamination. (*Id.* at HCC UF No. 27.)

8. Despite the consumption of hundreds of thousands of dairy shake blends, there have been no reports of sickness. (*Id.* at HCC UF Nos. 25 & 28.)

Wornick's Motion for Summary Judgment specifically agrees with many of the facts listed in HCC's Proposed Undisputed Facts. (*Compare* Doc. 20-2 *with* Doc. 22-1; *see also* HCC's Resp. Wornick's Proposed Undisputed Facts, attached hereto.) Further, those facts that Wornick does not explicitly agree with, it does not contradict.

### B. Wornick Includes Misleading and Irrelevant Facts in Its Motion for Summary Judgment.

Wornick spends a number of pages discussing HCC's claim investigation and denial of coverage. (Doc. 22-29, "Undisputed Facts," Section III, at PAGEID#: 592-596; *see also, e.g.*, HCC's Resp. Wornick's Proposed Undisputed Facts, Nos. 36, 58, 61-87, 89-104.) Of course, this is irrelevant to Wornick's Motion for Summary Judgment, which is limited to coverage issues. (*Id.*) Moreover, Wornick's depiction of many of these facts, and of the claim process, is incomplete and inaccurate. (*Id.*) In particular, Wornick fails to present the thoroughness of HCC's response to Wornick's claim, including claim adjuster Michael Tocicki's extensive investigation and coverage counsel's careful review and analysis of Wornick's claim. (*Id.*) Mr. Tocicki and coverage counsel's work is well documented, however, in their reports and letters, even though these documents do not encompass the many additional emails and conference calls that took place between Mr. Tocicki, coverage counsel, HCC's representatives, and Wornick's representatives. (*See e.g.*, Docs. 23, 22-15, 22-16, 22-17, 22-18, 22-19 & 22-26.) Coverage was ultimately denied for the same reason summary judgment is appropriate: Wornick has failed to

show that its losses directly resulted from an ACCIDENTAL PRODUCT CONTAMINATION, as opposed to a prophylactic recall.

## III.   LAW AND ARGUMENT

### A.   Applicable Legal Standard

HCC incorporates Sections III.A and III.B. of its Motion for Summary Judgment. (Doc. 20-1 at PAGEID#:147-148.)  In those sections, HCC provided the controlling legal standard for interpreting an insurance contract.  Of particular significance, in interpreting an insurance contract, a court must examine the contract "as a whole" and not simply consider "detached or isolated parts thereof."  (*Id.* (quoting *Cincinnati Ins. Co. v. CPS Holdings, Inc.*, 115 Ohio St. 3d 306, 875 N.E.2d 31, 34 (2007) and *Whitt Mach., Inc. v. Essex Ins. Co.*, 377 F. App'x 492, 496 (6th Cir. May 13, 2010).)  In doing this, the court looks "to the plain and ordinary meaning of the language used in the policy unless another meaning is clearly apparent from the contents of the policy" and presumes "that the intent of the parties is reflected in the language used in the policy."  (*Id.* (quoting *Cincinnati Ins. Co.*, 875 N.E.2d at 34).)  The insured carries the burden of proving loss and establishing coverage. (*Id.*)

Further, while "[a]mbiguity in an insurance contract is construed against the insurer and in favor of the insured," this rule "will not be applied so as to provide an unreasonable interpretation of the words of the policy."  *Cincinnati Ins. Co.*, 875 N.E.2d 31 at 34; *Lager v. Miller-Gonzalez*, 120 Ohio St. 3d 47, 896 N.E.2d 666, 669; *Lager v. Miller-Gonzalez*, 120 Ohio St. 3d 47, 896 N.E.2d 666, 669 (2008) (noting that "a court cannot create ambiguity in a contract where there is none").  Consequently, an insurance contract can be considered ambiguous only if two or more reasonable interpretations of its provisions exist, when those provisions are viewed

in relation to the policy as a whole. *Id.*

**B.     The Policy Only Covers Losses "Resulting Directly" From an ACCIDENTAL PRODUCT CONTAMINATION.**

The relevant portion of the accidental product contamination policy that Wornick purchased (i.e., "SECTION 2") states in the "SCOPE OF COVERAGE" that HCC agrees to indemnify Wornick for LOSS (a defined term) "**resulting directly** from an ACCIDENTAL PRODUCT CONTAMINATION first discovered by the Named Insured during the Policy Period." (*See* Doc. 20-3, Ex. 5, Section 2, Scope of Coverage, at PAGEID#: 207 (emphasis altered from original).)

ACCIDENTAL PRODUCT CONTAMINATION, in turn, is a defined term with two prongs. (*Id.* at Section 2, Definitions, PAGEID#: 209.) The first prong requires the insured to show that:

1.     a **certain event** ("accidental or unintentional contamination, impairment or mislabeling");

2.     occurred **during the manufacturing process** ("during the manufacture, blending, mixing, compounding, packaging, labeling, preparation, production or processing (or storage on the premises of the Named Insured)");

3.     to **certain products** ("the Named Insured's PRODUCTS (including their ingredients or components)");

4.     or, alternatively, that there is **PUBLICITY** (a defined term) implying that this happened.

(*Id.*) The second prong requires the insured to show that there was:

5

1.   **fault in design specification** or performance of the Named Insured's PRODUCT(S).[1]

(*Id.*)  Finally, under either of these prongs, the definition of ACCIDENTAL PRODUCT CONTAMINATION requires the insured to show ("**provided always**") that:

> [T]he consumption or use of the Named Insured's CONTAMINATED PRODUCT(S) has . . . either resulted, or may likely result, in (1) physical symptoms of bodily injury, sickness or disease or death of any person(s) and/or (2) physical damage to (or destruction of) tangible property . . . other than PRODUCT(S) of the Named Insured.

(*Id.*)  The law specifies that none of these requirements can be read in isolation; instead, they must be considered "as a whole."  Consequently, PUBLICITY that does not "result[] directly" in a LOSS is not covered; likewise, "impairment" or "contamination" that occurs outside of, rather than during, the manufacturing process is not covered.

## C.   **Wornick's Arguments Fail To Consider The Policy "As a Whole."**

Notwithstanding the unambiguous language of the Policy, and the fact that the law requires the Policy to be interpreted "as a whole," Wornick's entire Motion is an exercise in rewriting "detached or isolated parts" of the Policy to provide coverage.  For example, Wornick asserts that various documents are "PUBLICITY" while ignoring that none of its losses "result[ed] directly" from these documents.  Likewise, Wornick argues that there has been "contamination" or "impairment," while ignoring that this alleged "contamination" and "impairment" occurred outside of the manufacturing process and, further, was neither accidental, nor unintentional.  When these detached and isolated arguments are placed in their proper context (i.e., when the Policy is construed "as a whole"), it is readily apparent that the Policy

---

[1] Since Wornick is now arguing that this second prong is a basis for coverage, because of "fault in design specification" of its products, that prong will be discussed in Section III.F, *infra*.

does not support such misreadings and, accordingly, that there is no coverage.

D.    **AFA 131, AFA 139, and the September 30, 2009 DLA Document Are Not PUBLICITY that "Result[ed] Directly" in Wornick's Alleged Loss.**

In its Motion for Summary Judgment, Wornick focuses on three alleged sources of PUBLICITY: (1) ALFOODACT ("AFA") 131 (dated July 1, 2009) (2) AFA 139 (dated August 12, 2009); and (3) a DLA document updated September 30, 2009. (Doc. 22-29, "Analysis," Section II.A, at PAGEID# 598-601.) Of course, none of Wornick's claimed losses "result[ed] directly" from these documents, which are not PUBLICITY; consequently, these documents cannot form a basis for coverage.

1.    **There Is No Causal Link Between the ALLFOODACTS and Wornick's Alleged Losses.**

Wornick argues that AFA 131 and AFA 139 are PUBLICITY under the Policy. As HCC explained in Section III.C.3.b of its Motion for Summary Judgment, which section is incorporated herein as if fully rewritten, AFA 131 and 139 are outside the "**SCOPE OF COVERAGE**" because they did not "result[] directly" in any of Wornick's losses; therefore, they cannot provide a basis for coverage. (Doc. 20-1, Section III.C.3.b, at PAGEID#:154-155; *see also* Doc. 20-3, Ex. 5, Section 2, Scope of Coverage, at PAGEID#: 207.) In an effort to skip over this unambiguous requirement, Wornick argues in conclusory fashion that: (1) "[a]s a result of [AFA 131], which required the destruction and replacement of certain Dairy Shakes, Wornick had to rework 700,000 cases of MREs"; and (2) AFA 131 and AFA 139 caused a "loss resulting directly from an accidental product contamination" because it required Wornick to incur nearly $2,800,000 in costs to rework the MREs. (Doc. 22-29, "Analysis," Section II.A.1-2, at PAGEID#: 599-600.)

7

Wornick fails to mention, however, that AFA 131 and AFA 139 were not addressed to Wornick and, did not require Wornick to do anything; instead, these documents were tools used to notify end users/consumers (i.e., soldiers) that dairy shakes in certain MREs should not be consumed, after the U.S. Military had already made the separate decision that Wornick would have to re-work product still under the U.S. Military's control.  (*See* Doc. 1-6, AFA 131, at PAGEID#: 45-48; Doc. 1-8, AFA 139, at PAGEID#: 53-57.)  Moreover, both AFA 131 (July 1, 2009) and AFA 139 (August 12, 2009) were issued *after* the Plainview Recall, and it was the Plainview Recall, not AFA 139 or AFA 131, which led to Wornick's claimed loss.[2]  In short, since AFA 131 and AFA 139 did not "result[] directly" in any of Wornick's alleged losses, they provide no basis for coverage.

### 2. The September 30, 2009 DLA Document Did Not "Result[] Directly" In Any of Wornick's Losses.

Wornick likewise argues that a September 30, 2009 DLA document creates coverage under the Policy.  Again, Wornick must show that it suffered a loss "resulting directly" from the purported PUBLICITY.  With regard to the DLA document, Wornick attempts to do this by asserting that: "Wornick sustained a covered loss as a result of this publicity because the Government required it to rework the affected MREs subsequent to the publication of this report."  (Doc. 22-29, "Analysis," Section II.A.3, at PAGEID#: 601.)  This argument, of course, has nothing to do with the Policy language ("resulting directly"), which unambiguously mandates that a causal relationship – not merely a temporal coincidence – link the PUBLICITY and the alleged loss.  Of course, and as even Wornick's conclusory argument concedes, there is

---

[2] Indeed, Wornick has attached a document that it asserts the U.S. Military sent it, regarding the U.S. Military's demand that Wornick rework the MREs.  (Doc. 22-1, Wornick UF Nos. 40-42.)  In that letter, DSCP Contract Officer James Lecollier noted that "DSCP is taking this action **based on** the FDA recall dated June 23, 2009 . . . ." (Doc. 22-8, Ex. G, at PAGEID#: 288 (emphasis added).)

no such connection.

In particular, the DLA document, like AFA 131 and AFA 139, is directed to end users/consumers within the U.S. Military, and it provides them with instructions on how to use the Defense Logistics Agency website to identify MRE dairy shakes that are safe to consume:

> If MREs on hand match BOTH the assembler and DOP/lot number the Dairyshake is safe to consume . . .
>
> If an MRE assembler's DOP/lot number IS NOT listed AND the MRE lot number is 9139 or earlier, the "DO NOT CONSUME ORDER" remains applicable – do not consume the Dairyshake.

(*See* Doc. 22-10, Ex. J, at PAGEID#: 296-297.)  This website, therefore, is not directed at Wornick and did not require Wornick to rework (or to assume the costs for reworking) the 700,000 MREs that it is now seeking to recover for under the Policy.  In fact, the DLA document actually states that "DLA Troop Support will rework MRE under DLA control; reworked lots will maintain the original DOP/lot number; reworked lots will have an 'R' placed on the case following the original DOP/lot number" – again showing that the U.S. Military's decision to require Wornick to re-work the 700,000 MREs was separate from (and before) the DLA document was posted.  (*Id.* at PAGEID#: 296)  Moreover, just like AFA 131 and AFA 139, the September 30, 2009 DLA document is dated long *after* the June 23, 2009 Plainview Recall which led to Wornick's alleged loss.  (*Id.*)

In short, since none of Wornick's alleged loss "result[ed] directly" from the September 30, 2011 DLA document, there is no coverage under the Policy

### 3.  AFA 131, AFA 139, and the DLA Document Are Not PUBLICITY Because They Are Not Reporting in Local, Regional, or National Media or Governmental Publications.

Moreover, to be PUBLICITY under the Policy, a document must be (among other things)

(1) "[t]he reporting of an actual or alleged ACCIDENTAL PRODUCT CONTAMINATION";

(2) "during the Policy Period"; (3) "in local, regional or national media (including but not limited

to radio, television, newspapers, magazines or the Internet)"; or (4) "any governmental

publication."  (Doc. 20-3, Ex. 5, Section 2, Definitions, at PAGEID#: 210.)  AFA 131, AFA 139,

and the DLA document are not PUBLICITY because they were neither reported "in local,

regional, or national media" nor "governmental publication[s]."

Wornick primarily asserts that AFA 131, AFA 139 and the DLA document are

"governmental publication[s]" because they were put on the internet by a governmental agency.

(Doc. 22-29, "Analysis," Section II.A, at PAGEID# 599-601.)  As defined, however,

"publication," requires the act of declaring or announcing something to the public, of making

something generally known.  Black's Law Dictionary at 1265 (9th ed. 2009) (defining

publication as "the act of declaring or announcing to the public"); Oxford Dictionaries,

*Publication*, http://oxforddictionaries.com/definition/english/publication (last visited October 19,

2012) (defining publication as "the action of making something generally known").

While these documents were placed on the internet, and therefore can be found by the

public, they are not announcing or declaring anything to the public, or making their contents

generally known to the public.  Instead, they are directed at end users and consumers within the

U.S. Military, not the public at large.   In particular, AFA 131 and AFA 139 list

"DISTRIBUTION: DoD wide."  (*See* Doc. 1-6, AFA 131, at PAGEID#: 47; Doc. 1-8, AFA 139,

at PAGEID#: 55.)  Likewise the DLA document is a website that was created to provide

"information to assist customers in determining if MRE stocks on hand are affected by the

Dairyshake 'Do Not Consume Order' or are safe to consume."  (Doc. 22-10, Ex. I, at PAGEID#:

296.)  In short, U.S. Military documents that are directed to an intra-military audience are not

"governmental publication[s]" merely because they are given an internet address, or because members of the public can obtain a copy of them.

Likewise, none of these documents were reported in "local, regional or national media (including but not limited to radio, television, newspapers, magazines or the Internet)."  (Doc. 20-3, Ex. 5, Section 2, Definitions, at PAGEID#: 210.)  When viewed in context, this reference to media means communication that is designed to reach the public. *See* Merriam-Webster's Dictionary, http://www.merriam-webster.com/dictionary/media (last visited October 19, 2012) (defining media as "members of the mass media" and mass media as "a medium of communication (as newspapers, radio, or television) that is **designed to reach the mass of the people**" (emphasis added).)    U.S. Military documents that are directed to an intra-military audience with no indication of further intended distribution are not reported in the media (i.e., by member of the mass media) and, moreover, are not designed to reach the public or the mass of the people.  This is true even if they are given an internet address, and even if members of the public can obtain a copy of them.

In short, since these documents are neither reporting "in local, regional or national media" nor "governmental publication[s]" they are not PUBLICITY, and they provide no basis for coverage.

### E.    Wornick's Arguments That There Has Been "Contamination" or "Impairment" Ignore the Unambiguous Language of the Policy

Wornick also argues that its products were "contaminated" or "impaired."  Wornick's arguments, however, again view those terms in isolation, and fail to consider the Policy as a whole.  In particular, Wornick ignores the fact that the Policy only covers (1) accidental or unintentional (2) impairment or contamination (3) that occurs during the manufacturing process

(4) to Wornick's PRODUCTS. Instead, Wornick suggests a clever, yet incorrect, reading of the Policy that attempts to create "contamination" or "impairment" where there was nothing wrong with the product during the manufacture of the MREs. Indeed, numerous tests did not result in one single test positive for Salmonella on any of the recalled product. (*See* Doc. 20-2, HCC UF Nos. 25 & 27.) Since Wornick cannot demonstrate any product that was actually contaminated or impaired during manufacture, there is no basis for coverage.

### 1. There Was No Contamination During The Manufacturing Process.

Wornick's arguments that its products were "corrupted by association" or "contaminated" because they were (1) "ordered not be [sic] consumed" and (2) "made with NFDM that was subject to recall" fails. (Doc. 22-29, "Analysis," Section II.D, at PAGEID#: 605.) The undisputed facts are that none of the recalled product tested positive for Salmonella. (*See* Doc. 20-1, at Section III.C.1, PAGEID#: 149-150.)[3] Again, a prophylactic recall cannot create a "contamination" when none of the product actually proved to be contaminated. *See Little Lady Foods, Inc. v. Houston Cas. Co.*, 819 F. Supp. 2d 759, 762-763 (N.D. Ill. 2011) (construing identical policy language and finding the policyholder's arguments for coverage unreasonable because there was no ACCIDENTAL PRODUCT CONTAMINATION); *Caudill Seed & Warehouse Co., Inc. v. Houston Cas. Co.*, 835 F. Supp. 2d 329, 333-336 (W.D. Ky. 2011) (construing identical policy language and finding that recall, and the possibility of contamination, were not enough to trigger coverage under the Policy).

Wornick's argument contradicts the plain language of the Policy that specifies that any

---

[3] There have only been two findings of salmonella contamination: (1) in Lot #9133 at Trans-Packers on or about May 28, 2009; and (2) on Plainview equipment on or about June 19, 2009. (Doc. 20-2, HCC UF No. 21; Doc. 22-1, at Wornick's UF Nos. 16-17.).

contamination (like any impairment) must occur **during the manufacturing process**.  (Doc. 20-3, Ex. 5, Section 2, Definitions, at PAGEID#: 209; *see also* Doc. 20-1, at Section III.C.2 (discussing, among other things, *Caudill Seed*, where the Chief Judge McKinley applied the same policy language in similar circumstances to find that there was no coverage because there had been no contamination or impairment during the manufacturing process).)  Nonetheless, Wornick claims that its product became contaminated as a result of the June 23, 2009 Plainview Recall and the do not consume orders (which, in turn, resulted from the June 23, 2009 Plainview Recall).  In other words, Wornick claims that its product became "contaminated" outside of the manufacturing process.  The Policy requires actual contamination, i.e., a test positive for Salmonella on Wornick's product, as part of the manufacturing process, to be an ACCIDENTAL PRODUCT CONTAMINATION.  Since there was no test positive for any contamination, and a recall itself cannot create a contamination during the manufacturing process, Wornick's argument that there was actual contamination must fail.

## 2. There Was No "Impairment" During the Manufacturing Process.

Wornick's impairment argument is similarly flawed.  Wornick argues that it is entitled to coverage because its goods were "impaired" when their "value and quality . . . diminished as a result of the contamination indecent."  (Doc. 22-29, "Analysis," Section II.B, at PAGEID#: 602-603.)  By "contamination incident" Wornick means the events surrounding the Plainview Recall.  (*Id.* at PAGEID#: 589-592.)  These events began on or about May 28, 2009, when salmonella contamination was found in Lot #9133 of dairy shake powder at the New York facilities of Trans-Packers.  (Doc. 20-2 at HCC UF No. 7.)  This May 28, 2009 finding led to a second finding of salmonella contamination on June 19, 2009 on the manufacturing equipment of Trans-

Packers' supplier, Plainview. (*Id.*, HCC UF Nos. 8-9.) After salmonella was found on its equipment, Plainview issued the recall on June 23, 2009. (*Id.* at HCC UF No. 10; *see also* Doc. 20-1 at PAGEID#: 140-142.) It is this recall that directly resulted in the alleged losses that Wornick is now seeking to recover. Consequently, Wornick is arguing that the "impairment" occurred after and as a result of the June 23, 2009 Plainview Recall because it was the Plainview Recall that caused the "value and quality" of Wornick's goods to be "diminished." (Doc. 22-29, "Analysis," Section II.B, at PAGEID#: 602-603.)

This argument fails, however, because it ignores that the Policy does not provide coverage for losses resulting directly from "impairment." (Doc. 20-3, Section 2, Scope of Coverage & Definitions, at PAGEID#: 207 & 209.) Rather, the Policy provides coverage for losses resulting directly from an ACCIDENTAL PRODUCT CONTAMINATION, a defined term that requires not only that Wornick's products be impaired, but also that any impairment occur **during the manufacturing process** ("during the manufacture, blending, mixing, compounding, packaging, labeling, preparation, production or processing (or storage on the premises of the Named Insured)"). (*Id.*; *see also* Doc. 20-1 at PAGEID#: 150-153.) Wornick's alleged "impairment," however, occurred outside of – not during – the manufacturing process; consequently, there is no coverage. (*Id.*)

More specifically, Wornick admitted that the dairy shakes Wornick now claims were "impaired" were shipped to Wornick months before the finding of salmonella contamination in Lot #9133 (May 28, 2009) and months before the Plainview Recall.[4] (Doc. 20-2, HCC UF No. 16; Doc. 20-1, PAGEID#: 142.) Further, these lots "were used in the MREs from 11/13/2007 to

---

[4] Lot #9133 was not Wornick's product, was not sold to Wornick, and was not part of Wornick's manufacturing process. (*See* Doc. 20-3, Ex. 2 at Resp. to Admis. No. 15 (admitting that there is no evidence "of Trans-Packers having sold to Wornick Dairy Shakes from Lot # 9133"); *see also id.* at Nos. 13-14 & 16.)

05/19/2009" – in other words, prior (and unrelated) to the finding of salmonella contamination in Lot #9133 (May 28, 2009), and long before the Plainview Recall.  (*Id.*)  To illustrate:



Consequently, the alleged "impairment" of Wornick's products occurred outside of the manufacturing process.  Since the Policy's definition of ACCIDENTAL PRODUCT CONTAMINATION requires that any impairment of Wornick's products must occur during the manufacturing process, there can be no coverage.

> **3.**  **There Has Been No "[A]ccidental or [U]nintentional" "Impairment" Or "Contamination" of Wornick's PRODUCTS.**

The definition of ACCIDENTAL PRODUCT CONTAMINATION also requires an "**accidental** or **unintentional** contamination [or] impairment . . . of the Named Insured's PRODUCTS . . . ."  (Doc. 20-3, Section 2, Definitions, at PAGEID#: 209 (emphasis added).)

The alleged "contamination" or "impairment" of Wornick's PRODUCTS in this case, however, was neither accidental nor unintentional.  Rather, it was the result of the Plainview Recall – an intentional decision made because of the alleged possibility of contamination.  It is the Plainview Recall that made Wornick's PRODUCTS, which never tested positive for salmonella contamination, less likely to be sold or consumed and, consequently, decreased their value.  In other words, it was the Plainview Recall that resulted in Wornick's alleged "impairment" or "contamination."

This is confirmed by Wornick's arguments.  In particular, Wornick argues that its PRODUCTS were "impaired" when their "value and quality . . . diminished **as a result of the contamination incident in that they were less likely to be sold or consumed**."  (Doc. 22-29 at PAGEID#: 603 (emphasis added).)  Likewise, it argues that its PRODUCTS were "contaminated" because they were (1) "**ordered** not be [sic] consumed" or (2) "made with NFDM that was **subject to recall**."  (*Id.* at PAGEID#: 605 (emphasis added).)  This sort of alleged "contamination" or "impairment," however, which resulted from an intentional, deliberate decision (i.e., from the Plainview Recall) cannot be termed accidental or unintentional, even though it was legal and, in some sense, outside of Wornick's control.[5]  Since the alleged impairment of Wornick's products was neither accidental nor unintentional, there has been no ACCIDENTAL PRODUCT CONTAMINATION.[6]

---

[5] Significantly, however, Wornick did not believe that its contract with the U.S. Military required it to bear the expense of re-working the MREs; nonetheless, it performed the re-work "as a Customer Service function, while retaining [its] rights under the contract."  (*See generally* Doc. 20-3, Ex. 6, at PAGEID#: 222-231.).

[6] The Policy also provides coverage for "Malicious Product Tampering."  Any such PRODUCT TAMPERING must involve "intentional, malicious and illegal alteration or contamination of the Named Insured's PRODUCT(S)."  (Doc. 20-3, Ex. 5, at PAGEID#: 206.)   The Plainview Recall was neither malicious nor illegal, consequently, there has been no PRODUCT TAMPERING.  This underscores, once again, however, that Wornick did not purchase a recall policy – it purchased a "Malicious Product Tampering / Accidental Product Contamination" Policy.  Unsurprisingly, that Policy does not provide coverage in situations like this, where there has not been any malicious

Indeed, it bears repeating in this context that, despite extensive testing (and consumption) of the dairy shakes, there have only been two findings salmonella at any time: (1) in Lot #9133 at Trans-Packers on or about May 28, 2009; and (2) on Plainview equipment on or about June 19, 2009. Neither the Plainview equipment, nor Lot #9133, was Wornick's PRODUCT. As a result, there has not been contamination or impairment of Wornick's PRODUCTS so as to create an ACCIDENTAL PRODUCT CONTAMINATION, or coverage under the Policy.

### 4. **Wornick Is Reading the Policy Completely Out of Context.**

When viewed together, the arguments in Sections III.E.1-3, *infra*, underscore the unavoidable fact that Wornick is taking its definition of "impairment" (and "contamination") completely out of context. The Policy does not simply list "impairment" or "contamination" in a vacuum; instead, those words are placed in the context of Section 2 of the Policy and, in particular, in the context of ACCIDENTAL PRODUCT CONTAMINATION, a defined term. (Doc. 20-3 at PAGEID#: 209 (emphasis added).) Reading through this language, as a whole and in context, rather than pulling out isolated words, shows that the Policy covers a situation (i.e., an accidental product contamination) that simply did not occur here. Consequently, interpreting the Policy as Wornick suggests would not only disregard the Policy's unambiguous requirements, but also ignore this context and the parties' intent. In short, Wornick purchased an accidental product contamination, not a recall, Policy. There has, however, been no accidental contamination of Wornick's products, so there is no coverage.

---

product tampering or an accidental contamination of Wornick's products. This result is unsurprising because a recall, and the possibility of contamination, are not enough to trigger coverage under the Policy. *See e.g.*, *Caudill Seed*, 835 F. Supp. 2d at 333-335; *Little Lady*, 819 F. Supp. at 762-763.

**F.**     **Wornick's Argument That Its Products Failed To Meet Specifications Contradicts Its Own Representations And Has Nothing To Do With the Language of the Policy.**

The Policy's definition of ACCIDENTAL PRODUCT CONTAMINATION contains a second prong, which covers: "fault in design specification . . . of the Named Insured's PRODUCT(S)." (Doc. 20-3, Ex. 5, Section 2, Definitions, at PAGEID#: 209.)  In a conclusory, one paragraph argument, Wornick attempts to assert that this provision means that there was an ACCIDENTAL PRODUCT CONTAMINATION.  (Doc. 22-29, "Analysis," Section II.C, at PAGEID#: 604.)  In particular, Wornick argues that its products "fail[ed] to meet specifications" because Wornick's customer, the U.S. Military, determined that the MREs did not meet a requirement contained in the U.S. Military's contract with Wornick which "required that the MREs be 'free from defects in material or workmanship.'"  (*Id.*)

As an initial matter, Wornick's assertion that its products "fail[ed] to meet specifications" is contrary to Wornick's representation to its customer, the U.S. Military.  (*See generally* Doc. 20-3, Ex. 8, at PAGEID#: 226-231 (Wornick's attorney explaining that the product met specifications).)  More importantly, however, Wornick once again misreads the language of the Policy.  In particular, Wornick argues that the product "fail[ed] to meet specifications"; but this is irrelevant because the second prong of the ACCIDENTAL PRODUCT CONTAMINATION definition says nothing about failure to meet specifications – instead, it applies to "fault in design specifications."  (*Compare* Doc. 20-3, Ex. 5, at PAGEID#: 209 *with* Doc. 22-29, "Analysis," Section II.C, at PAGEID#: 604.)  Here, there is no evidence of any fault in the design specifications.  Consequently, this argument cannot provide a basis for coverage.

**G.    Wornick Does Not Show That Consumption or Use of Its Product Either Resulted, or May Likely Result, in Sickness, Disease, or Death.**

Before there can be ACCIDENTAL PRODUCT CONTAMINATION (of any kind, including PUBLICITY or "fault in design specification"), the Policy requires:

> **provided always** that the consumption or use of the Named Insured's CONTAMINATED PRODUCT(S) has, within 120 days of such consumption or use, either resulted, or may likely result, in: (1) physical symptoms of bodily injury, sickness or disease or death of any person(s) and/or (2) physical damage to (or destruction of) tangible property, including animals and/or livestock – other than PRODUCT(S) of the Named Insured.

(Doc. 20-3, Section 2, Definitions, at PAGEID#: 209 (emphasis added).)  Although it bears the burden of establishing coverage, Wornick offers no argument in its Motion for Summary Judgment that it meets this requirement.   In this regard, HCC incorporates its argument in Section III.C.4 of its Motion for Summary Judgment, and emphasizes that, despite extensive testing (and consumption) of the dairy shakes, no salmonella contamination of any kind was ever found in any of Wornick's products.  (Doc. 20-1, Section III.C.4, at PAGEID#: 155-156.)  This was confirmed not only by Trans-Packers and Wornick's customer, the U.S. Military, but also by Wornick's Chief Financial Officer, Dustin McDulin, and by Wornick's attorneys in their representations to the U.S. Military.  (*Id.*)

**H.    Should this Case Proceed, A Genuine Issue of Material Fact Remains As to the Nature and Extent of Wornick's Alleged Damages.**

Wornick and HCC have both filed Motions for Summary Judgment.  These Motions address coverage and (with regard to HCC's Motion for Summary Judgment only) bad faith issues.  Should this case proceed, however, a genuine issue of material fact remains as to the categorization, accuracy, nature, and extent of Wornick's alleged damages.  For example, Wornick has not properly categorized its losses as required by the Policy's limits of liability.

(*See* Doc. 20-3, Ex. 5, Declarations (including, among other "Limits of Liability," $250,000 for "Rehabilitation Expenses" in addition to the $1,000,000 "Aggregate Per LOSS"); *see also, e.g.*, Doc. 23, Ex. N, at PAGEID#: 616 (Tocicki's first investigative report, which Wornick attached to its Motion, and which discussed, among other things, the sublimit for rehabilitation expenses.); Doc. 22-18, Ex. R, PAGEID#: 488.)  Further, there are issues regarding the total amount of Wornick's loss.  (*See e.g.*, Doc. 22-18, Ex. R, at PAGEID #: 492-493.)

## IV.    CONCLUSION

Wornick's Motion for Summary Judgment seeks summary judgment with respect to two counts in Wornick's Complaint: (1) "Count I – Declaratory Judgment"; and (2) "Count II – Breach of Contract."   Since Wornick's alleged losses resulted from a recall and not an ACCIDENTAL PRODUCT CONTAMINATION, however, Defendant Houston Casualty Company respectfully requests that the Court deny Wornick's request for summary judgment as to Wornick's breach of contract claim and, further, that the Court declare that there is no coverage afforded to Wornick under the Policy.

Respectfully submitted,

*s/ Kevin M. Young*
Kevin M. Young (0029715)
Karl A. Bekeny (0075332)
Jesse W. Thomas (0085253)
TUCKER ELLIS LLP
925 Euclid Avenue, Suite 1150
Cleveland, OH 44115-1414
Telephone:    216.592.5000
Facsimile:    216.592.5009
E-mail:        kevin.young@tuckerellis.com
               karl.bekeny@tuckerellis.com
               jesse.thomas@tuckerellis.com

*Attorneys for Defendant*
*Houston Casualty Company*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 19, 2012, a copy of Defendant Houston Casualty Company's **Opposition to the Wornick Company's Motion for Summary Judgment** and **Response to Wornick's Proposed Undisputed Facts** was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Respectfully submitted,

<u>*s/Kevin M. Young*</u>
Kevin M. Young (0029715)
Karl A. Bekeny (0075332)
Jesse W. Thomas (0085253)
TUCKER ELLIS LLP
925 Euclid Avenue, Suite 1150
Cleveland, OH 44115-1414
Telephone:    216.592.5000
Facsimile:    216.592.5009
E-mail:        kevin.young@tuckerellis.com
                karl.bekeny@tuckerellis.com
                jesse.thomas@tuckerellis.com

*Attorneys for Defendant*
*Houston Casualty Company*

011017.000116 1549127.2