IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| THE WORNICK COMPANY,<br><br>    Plaintiff,<br><br>v.<br><br>HOUSTON CASUALTY COMPANY,<br><br>    Defendant. | ) CASE NO. 1:11-CV-391-SJD<br>)<br>) CHIEF JUDGE SUSAN J. DLOTT<br>)<br>)<br>) **DEFENDANT HOUSTON CASUALTY**<br>) **COMPANY'S REPLY IN SUPPORT OF**<br>) **ITS MOTION FOR SUMMARY**<br>) **JUDGMENT**<br>) |

**I.     INTRODUCTION**

There has never been an accidental product contamination of Plaintiff The Wornick Company's ("Wornick") products. This is shown by the undisputed, material fact that salmonella contamination has only been found in two places: (1) in Lot #9133 at Trans-Packers; and (2) on Plainview equipment. (Ex. 9, attached hereto, at Undisputed Fact No. 21.) Neither Lot #9133 nor Plainview's equipment was Wornick's product (or an ingredient or component of Wornick's product). (*See* Section III.B.1 & fn. 7, *infra*.) Instead, Wornick's alleged loss resulted from a recall, and the alleged possibility of contamination. As another court recently concluded when considering a similar motion, a recall "does not create a defect in the product itself," and "[t]he mere possibility that a product may contain a contaminate does not trigger coverage" under an Accidental Product Contamination Policy. *Ruiz Food Products, Inc. v. Catlin Underwriting U.S., Inc.*, 2012 WL 4050001, *10-*11 (E.D. Cal. Sept. 13, 2012). Since a recall cannot create an accidental product contamination, and since Wornick purchased an Accidental Product Contamination (not a recall) Policy, there is no coverage.

## II. THE UNDISPUTED FACTS

### A. Wornick Has Admitted HCC's Proposed Undisputed Facts.

In its response to Defendant Houston Casualty Company's ("HCC") Proposed Undisputed Facts, Wornick unequivocally admits most of HCC's proposed undisputed facts. (*See* Ex. 9, attached hereto,[1] at Undisputed Facts Nos. 1, 3-5, 7-8, 11-14, 16-17, 20, 22-24, 30-33.) The remaining responses do no create an issue of material fact. (*Id.* at 2, 6, 9-10, 15, 18-19, 21, 25-29.) Consequently, HCC emphasizes, as it did in its Opposition to Wornick's Motion for Summary Judgment, that Wornick has admitted all of the material facts necessary to resolve this dispute. (*Compare* Doc. 25, Section II.A, at PAGEID#: 680-681 (listing, among others, several important facts) *with* Ex. 9, attached hereto.)

### B. None of the "Issues of Material Fact" That Wornick Proposes "In the Alternative" Are Issues of Fact.

Wornick's Response to HCC's Proposed Undisputed Facts also lists "[i]n the alternative" twelve "issues of material fact" that "preclude entry of summary judgment in HCC's favor." (Doc. 24-1, at PAGEID#: 657-658.) None of these proposed "issues of material fact" are issues of fact. Instead, they are matters of law for the Court's determination. In particular, Wornick's proposed "issues of material fact" simply raise the same issues (e.g., whether there has been "contamination," "impairment," PUBLICITY, bad faith) addressed in the briefing before the Court. (*See* Ex. 9, attached hereto, at pp. 19-23 (responding to each of Wornick's proposed "issues of material fact").).

---

[1] To assist the Court in evaluating Wornick's Responses, HCC has provided a Final Statement of Undisputed Facts, attached hereto as Exhibit 9, which lists each of HCC's proposed undisputed facts, Wornick's response, and then provides a final statement of undisputed fact.

## III.    LEGAL ANALYSIS

### A.    Notwithstanding Wornick's Arguments to the Contrary, the Policy Must Be Construed As a Whole and It Is Wornick's Burden To Establish Coverage.

Wornick's Opposition, like its Motion for Summary Judgment, ignores and misconstrues numerous provisions of the Policy and, at times, attempts to shift its burden to HCC. In response, HCC reiterates several controlling points of law:[2]

- The insured, Wornick, carries the burden of proving loss and establishing coverage. *Inland Rivers Serv. Corp. v. Hartford Fire Ins. Co.*, 20 O.O.3d 20, 418 N.E.2d 1381, 1383 (1981); *U.S. Fire Ins. Co. v. Chardon Rubber Co.*, 961 F.2d 1580, *4 (6th Cir. Apr. 23, 1992) (table).

- The Policy must be considered "as a whole," and not in "detached or isolated parts." *Cincinnati Ins. Co. v. CPS Holdings, Inc.*, 115 Ohio St. 3d 306, 875 N.E.2d 31, 34 (2007); *Whitt Mach., Inc. v. Essex Ins. Co.*, 377 F. App'x 492, 496 (6th Cir. May 13, 2010).

- In interpreting the Policy, "the role of a court is to give effect to the intent of the parties to the agreement." *Cincinnati Ins. Co.*, 875 N.E.2d at 33.

- The Court looks "to the plain and ordinary meaning of the language used in the policy unless another meaning is clearly apparent from the contents of the policy" and presumes "that the intent of the parties is reflected in the language used in the policy." *Id.* at 34.

- The Policy can be considered ambiguous only if two or more reasonable interpretations of its provisions exist, when those provisions are viewed in relation to the Policy as a whole. *Id.*; *Lager v. Miller-Gonzalez*, 120 Ohio St. 3d 47, 896 N.E.2d 666, 669 (2008).

---

[2] HCC has never disputed that Ohio law governs Wornick's claims for breach of contract and declaratory judgment. (Doc. 20-1, Section III.B, at PAGEID#: 147-148 & fn. 6; *cf.* Doc. 24, "Analysis," Section II.A, at PAGEID#: 644-645.) The only issue has been the law to apply to Wornick's bad faith claim. (Doc. 20-1, Section III.D, at PAGEID#: 157 & fn. 10-12; *see also* footnote 17, *infra*.)

### B. There Has Been No Contamination or Impairment of Wornick's PRODUCTS.

Throughout its Opposition, Wornick argues that its products were contaminated or impaired. But there is a problem with this argument: no defect, fault, or contamination of any kind has actually been found in any of Wornick's PRODUCTS (including their ingredients and components). Instead, Wornick's losses resulted from the Plainview Recall.[3] A recall will not trigger coverage under the Policy, however, because coverage under HCC's Accidental Product Contamination Policy "is not triggered by a recall or classification of a recall, but instead by whether a product has been contaminated under the terms of the policy." *Hot Stuff Foods, LLC v. Houston Cas. Co.*, 2012 WL 2675225, *8 (D.S.D. July 5, 2012) (construing identical policy language); *see also Ruiz Food*, 2012 WL 4050001, at *6, *9-*10.[4]

Undaunted by this fact, and determined to trigger coverage, Wornick attempts to rewrite the Policy by cramming the Plainview Recall into the definition of ACCIDENTAL

---

[3] Noting that Wornick's losses resulted from the Plainview Recall is only part of the story because, while it is undisputed that many of the dairy shakes Wornick recalled and reworked were subject to the Plainview Recall, Wornick has also admitted that it reworked the MREs as a customer service function under its contract with the U.S. Military, even though it did not believe that any such re-work was necessary or required by its contract with the U.S. Military. (*See, e.g.*, Doc. 20-3, Exs. 6-8.) In this regard, Wornick incorrectly suggests that HCC "selectively quotes from an email to suggest that Wornick voluntarily reworked the MREs as a 'Customer Service function'" and emphasizes that "the Government **required** Wornick to rework the MREs in that Wornick would bear the cost of the rework whether it or some other entity performed the work." (Doc. 24, "Facts," at PAGEID#: 634 (emphasis in original).) As the referenced email shows, Wornick's assertion is without merit. (Doc. 20-3, Ex. 7.) Instead, Wornick had a contract with its customer, the U.S. Military. (*Id.*) The U.S. Military wanted Wornick to re-work the 700,000 MREs under that contract. (*Id.*) Wornick agreed to do so as a "Customer Service function" (or business decision) even though it did not believe that its contract with its customer, the U.S. Military, required it to do so. (*Id.*; *see also* Doc. 20-3, Ex. 8.) Obviously, a business decision, made months after the Plainview Recall, does not make the PRODUCTS "accidentally or unintentionally" contaminated or impaired during the manufacturing process.

[4] In *Hot Stuff*, the parties did "not dispute that the sausage breakfast sandwiches **did contain** MSG, thus, they were not properly labeled" and satisfied "the 'mislabeled' portion within the definition of accidental product contamination." 2012 WL 2675225, at *5 (emphasis added). Instead, the parties disputed whether the consumption of MSG – which, again, was actually in Hot Stuff's PRODUCTS – "may likely result, in (1) physical symptoms of bodily injury, sickness or disease or death of any person(s)." *Id.* Here, unlike *Hot Stuff*, salmonella has never been found in any of Wornick's PRODUCTS.

4

PRODUCTION CONTAMINATION.[5]  In particular, and since one of the requirements for an ACCIDENTAL PRODUCT CONTAMINATION is that there be contamination or impairment of Wornick's PRODUCTS, Wornick argues that the Plainview Recall made its PRODUCTS "contaminated" or "impaired."  For example, Wornick states that:

- "It was during manufacturing and production that Dairy Shakes <u>containing recalled NFDM</u> were incorporated into Wornick's MREs, causing the MREs to become a contaminated product.  That <u>the recalled Dairy Shakes</u> were shipped to Wornick before the discovery of salmonella in Lot No. 9133 and on Plainview's equipment does not indicate anything about the time of contamination of Wornick's MREs. Moreover, that the shipment of <u>the recalled Dairy Shakes</u> pre-dated the positive salmonella tests does not mean that <u>the recalled Dairy Shakes</u> were not contaminated."  (Doc. 24, "Analysis," Section I.C, at PAGEID#: 638 (emphasis added).)

- "Similarly, impairment of Wornick's MREs also occurred during the manufacturing and production process. It was during this process that <u>the recalled Dairy Shakes</u> were incorporated into Wornick's MREs, thereby diminishing their value and quality. From the moment that Wornick's MREs contained <u>this recalled product</u>, they were less likely to be sold or consumed."  (*Id.* (emphasis added).)

- "Here, the MREs were corrupted by association.  Specifically, they were contaminated because they contained Dairy Shakes that were (1) ordered not be consumed and (2) <u>made with NFDM that was subject to recall</u>."  (*Id.*, "Analysis," Section I.B, at PAGEID#: 637 (emphasis added).)

- "Each of the lots of MREs that the Government required Wornick to retrieve are traceable to Dairy Shakes <u>made with recalled NFDM</u>.  (*Id.* at PAGEID#: 637-638 (emphasis added).)

---

[5] Wornick also asserts that "[a]lthough titled a Malicious Product Tampering/Accidental Product Contamination Policy the Policy does indemnify for recall expenses." (Doc. 24, "Facts," at PAGEID#: 633.)  The Policy language that Wornick points to states that LOSS includes: "[a]ny reasonable expenses necessarily incurred by the Named Insured in the procedure of recall, inspection, examination, destruction or disposal of the Named Insured's PRODUCT(S)." (Doc. 20-3, Ex. 5, Section, 2, Definitions, at PAGEID#: 208.)  Critically, however, the SCOPE OF COVERAGE contained in Section 2 only indemnifies Wornick for LOSS "resulting directly" from an ACCIDENTAL PRODUCTION CONTAMINATION, a defined term that does not mention recall.  (*Id.* at Section 2, Scope of Coverage, at PAGEID#: 207.)  If there has been no ACCIDENTAL PRODUCT CONTAMINATION, there can be no coverage.

- "As a result of the salmonella contamination incident, Wornick's MREs suffered an impairment, becoming diminished in value and quality and less likely to be sold or consumed. Wornick's MREs also became contaminated in that they contained Dairy Shakes made with nonfat dry milk <u>subject to recall</u>." (*Id.*, "Introduction," at PAGEID#: 632 (emphasis added).)

These arguments must fail, however, because a recall, absent some taint, defect, or contaminant in Wornick's PRODUCTS cannot, itself, trigger coverage under the Accidental Product Contamination Policy that Wornick purchased.

### 1. No Defect, Taint, or Contaminant of Any Kind Has Been Found In Wornick's PRODUCTS.

The undisputed facts show that Wornick has absolutely no evidence that there was any taint, defect, or contaminant of any kind in any of its PRODUCTS. In particular, there has been no finding of salmonella, and no finding of contamination of any kind, on any of Wornick's PRODUCTS. (*See* Ex. 9, attached hereto, at Undisputed Facts Nos. 7-9, 21-23, 25-28; *see also* Doc. 24-3, Ex. DD & Doc. 20-3, Ex. 2, at Resp. Req. Admis. Nos. 13-19.) Instead, the evidence shows that salmonella has only been found in two places: (1) in Lot #9133 at Trans-Packers on or about May 28, 2009; and (2) on Plainview equipment on or about June 19, 2009.[6] (*Id.*) Neither Plainview equipment, nor any dairy shake product in Lot #9133, was Wornick's PRODUCT (or an ingredient or component of Wornick's PRODUCT).[7] (*Id.*) In fact, all of the

---

[6] Wornick asserts that "HCC has pointed to no negative test results for the retrieved and reworked MREs, the MREs were not simply placed on hold but had to be retrieved and reworked, and none of the MREs were sold." (Doc. 24, "Analysis," Section I.C, at PAGEID#: 639.) Of course, the burden is on Wornick to produce evidence of contamination or impairment. *Inland Rivers*, 418 N.E.2d at 1383; *Chardon Rubber*, 961 F.2d at 1580. Moreover, the same MREs that Wornick retrieved and re-worked did undergo extensive testing during the manufacturing process (and prior to their sale and shipment to Wornick's customer, the U.S. Military) – all of which came back negative. (*See* Ex. 9, attached hereto, Undisputed Facts Nos. 14, 27-28; *see also* Doc. 22-28, Ex. BB.)

[7] Wornick claims that "[t]he Dairy Shakes constitute the 'Named Insured's PRODUCT(S).'" (Doc. 24, "Analysis," Section I.B, at PAGEID#: 637.) The Policy, however, defines PRODUCTS as "[a]ll goods or products (finished or in process), including all ingredients or components thereof, manufactured, distributed, handled by the Named Insured (or manufactured by a contract manufacturer for the Named Insured) and which are (or will be) available for

6

dairy shakes Wornick now claims were "contaminated" were actually shipped from Trans-Packers to Wornick between **10/23/2007 and 12/02/2008** (i.e., months before the finding of salmonella contamination in Lot #9133). (Ex. 9, attached hereto at Undisputed Fact No. 16.) Consequently, there was never any taint, defect, or contaminant of any kind in Wornick's PRODUCTS.

This failure to produced evidence of any defect, taint, or contaminant of any kind in its PRODUCTS is determinative of Wornick's arguments that "contamination" or "impairment" has occurred. This is because the Policy must be construed "as a whole," with each word examined in context. *Cincinnati Ins. Co.*, 875 N.E.2d at 34; *see also Foster Wheeler Enviresponse, Inc. v. Franklin County Convention Facilities Auth.*, 78 Ohio St. 3d 353, 678 N.E.2d 519, 526 (1997); *Sunoco, Inc. (R & M) v. Toledo Edison Co.*, 129 Ohio St. 3d 397, 953 N.E.2d 285, 293 (2011) (explaining that under the doctrine of "noscitur a sociis" (Latin "it is known by its associates") the meaning of words or provisions in a contract may be derived or controlled by the words with which they are associated).

---

sale by the Named Insured." (Doc. 20-3, Ex. 5, Section 2 at Definitions, at PAGEID#: 209.) While HCC does not dispute that some dairy shakes (i.e., those dairy shakes that were manufactured for Wornick, and incorporated into Wornick's MREs) are Wornick's PRODUCT (or a component of Wornick's PRODUCT), that does not mean that every dairy shake manufactured by Trans-Packers, or made with dairy powder from Plainview, was Wornick's PRODUCT (or a component of Wornick's PRODUCT). To the contrary, Plainview does not sell dairy powder directly to Wornick (or exclusively to Trans-Packers), and Trans-Packers manufactures dairy shakes for companies other than Wornick. (*See* Ex. 9, attached hereto, at Undisputed Facts Nos. 22-24, 10-12; *see also* Doc. 24-3, Ex. DD & Doc. 20-3, Ex. 2, at Resp. Req. Admis. Nos. 18-19, 22-23.) Consequently, only certain dairy shakes (i.e., those manufactured by Trans-Packers for Wornick) are Wornick's PRODUCT (or a component of Wornick's PRODUCT); many others are not – including the diary shakes in Lot #9133, which Wornick has admitted it did not purchase from Trans-Packers. (*See id.*; Doc. 24-3, Ex. DD & Doc. 20-3, Ex. 2, at Resp. Req. Admis. No. 15; *see also* Ex. 9, attached hereto, at Undisputed Fact No. 16 (explaining that all of the dairy shakes Wornick now claims were "contaminated" were actually shipped to Wornick months before the finding of salmonella contamination in Lot #9133).) Accordingly, it is incorrect for Wornick to say that it "is entitled to contamination coverage based on Lot No. 9133 of Dairy Shakes, which indisputably tested positive for salmonella. The Dairy Shakes are a 'component' product of the MRES, even when still 'in process.'" (Doc. 24, "Analysis," Section I.B, at PAGEID#: 638, fn.4.) To the contrary, and notwithstanding its burden to establish coverage, Wornick has provided no evidence that any dairy shakes from Lot #9133 were manufactured for or sold to Wornick, were Wornick's PRODUCTS, or were a component (or ingredient) of Wornick's PRODUCTS.

In context, the words "contamination" and "impairment" are part of a defined term (ACCIDENTAL PRODUCT CONTAMINATION), placed in the phrase "accidental or unintentional contamination, impairment or mislabeling," and surrounded by a series of phrases, including: (1) "during the manufacture, blending, mixing, compounding, packaging, labeling, preparation, production or processing (or storage on the premises of the Named Insured)"; (2) "of the Named Insured's PRODUCTS (including their ingredients or components)"; and (3) the "consumption or use" clause. (Doc. 20-5, Ex. 5, Section 2, Definitions.) When this language is read together, as it must be, it is clear that the Policy does not provide coverage for losses resulting from a recall, or the possibility of contamination, but rather for losses resulting from an actual defect, taint, or contaminant in the named insured's PRODUCTS during the manufacturing process – in other words, for losses resulting from an accidental product contamination, which never happened here.[8]

Courts that have considered the same (or similar) policy language in analogous factual circumstances have confirmed HCC's interpretation of the Policy. For example, in a recent

---

[8] Wornick's citation to the deposition testimony of Karl Smith (HCC's corporate designee), Michael Tocicki (the claims adjuster), and William Kidder (the underwriter) is irrelevant. (*See, e.g.*, Doc. 24, "Analysis," Section I.A-B, at PAGEID#: 635-637 (noting, among other things, that contamination and impairment are not defined terms under the Policy).) As an initial matter, interpreting the language of the Policy is a question of law, and the language of the Policy, not the testimony of these deponents, controls. *See also Ruiz Food*, 2012 WL 4050001, at *8 & fn.3 (noting also that "the interpretation of the insurance policy is an issue of law and the claims handler's interpretation is irrelevant"). Moreover, it is obvious (and undisputed) that the terms "contamination" and "impairment" are undefined in the Policy. (Doc. 20-3, Ex. 5, Section 2, Definitions, at PAGEID#: 209.) In fact, in any policy, some words will necessarily be undefined. This does not mean, however, that Wornick is entitled to coverage, or to fail to consider the Policy "as a whole" and to read these terms completely out of context. *Cincinnati Ins. Co.*, 875 N.E.2d at 34. And, indeed, when the Policy is read "as a whole" it is clear that, notwithstanding Wornick's arguments, there has been no ACCIDENTAL PRODUCT CONTAMINATION. This is because absent some accidental or unintentional taint, defect, or contaminant in the named insured's PRODUCTS, during the manufacturing process, a recall, and the possibility of contamination or of a "stigma" will not result in an ACCIDENTAL PRODUCT CONTAMINATION. (*See also, e.g.*, Doc. 22-12, Ex. K., Smith Dep. at 102:13-21 (noting that "[w]e don't have contamination in this instance. That's the key point of accidental product contamination, and we do not have any indication that the shakes that were shipped to the insured were contaminated."), 103:8-19 (explaining that the language of the Policy must be viewed as a whole and in context), 135:18-25, 136:1-21.

decision – *Ruiz Food* – the Court denied coverage after construing nearly identical policy language in a very similar factual context. In that case:

- An insured, Ruiz Food, made Tornados, a ready to eat product similar to burritos. The Tornados included a beef spice mix, which was produced by Ruiz Food's supplier, Superior Quality Foods (Superior). *Id.* at *1. The beef spice mix, in turn, contained hydrolyzed vegetable protein ("HVP") which was manufactured by Basic Food Flavors ("Basic"). *Id.*

- In February, 2010, while FDA inspectors were conducting testing at Basic's facilities, a sample from a finished lot of HVP tested positive for Salmonella. *Id.* (noting that environmental samples collected from the Basic facility near the food processing equipment also tested positive for Salmonella). This lot was not sent to Superior and never reached Ruiz Food; however, after the positive test, Basic (and Superior) issued a recall that extended to HVP (and spicy beef mix) that had been incorporated into Ruiz Food's Tornados. *Id.* at *1-*2.

- Despite extensive testing, none of Ruiz Food's Tornados tested positive for Salmonella; nonetheless, Ruiz Food ultimately recalled its Tornados "due to potential Ssalmonella [sic] contamination" because "they had incorporated HVP from Basic that was subject to the FDA recall." *Id.* at *2 (noting that "[t]he recall committee of the FSIS found that Tornados needed to be recalled because they had incorporated HVP from Basic that was subject to the FDA recall").

After recalling its Tornados, Ruiz Food made a claim under a product contamination policy that was very similar[9] to the Policy at issue here. *Ruiz Food*, 2012 WL 4050001, at *6-*12.

In rejecting coverage, the court explained that, for a claim under a product contamination policy, "[t]he potential to cause injury" does not "alter the requirement of showing that the contamination or impairment is **actually present**." *Id.* at *7-*8 (emphasis added). Moreover, with regard to "impairment" the court (facing very similar arguments to those presented here)

---

[9] The policy in *Ruiz Food* defined "accidental contamination" as "any accidental or unintentional contamination, impairment or mislabeling of an *Insured product(s)*, which occurs during or as a result of its production, preparation, manufacture, packaging or distribution; provided that the use or consumption of Insured product(s) . . . ." *Ruiz Food*, 2012 WL 4050001, at *2-*3 (emphasis in original).

9

recognized that, even though the product contamination policy did not define impairment, the term was not ambiguous:

> The Court accepts [the insurer's] argument that impairment **must be to the product itself**, and not as a result of the collateral circumstances surrounding the product. Applying *Black's Law Dictionary* definition and the reasoning of *Little Lady*, the product itself must be impaired from the contamination of Ruiz' ingredients. The mere potential contamination of Ruiz' ingredients does not result in an "Insured product" being "damaged, weakened or diminished," and also does not result in a "diminish[ed] value" of the product itself. A defect or flaw in "the product itself" results from the incorporation of an ingredient that can not be sold to the public, and has been deemed by the FDA to present a "reasonable probability that the use of the product will cause serious, adverse health consequences." The **recall of a ingredient**, requiring recall of the Tornados, **does not constitute a "defect or flaw in the product itself."** The defective ingredients did not reach Ruiz. The samples tested by Basic, Superior and Ruiz of the HVP incorporated in the Tornados were negative for Salmonella, there was no potential for Salmonella contamination, thus, there was no defect, flaw or impairment in the Tornados. Thus, **the FDA's imposition of a recall does not create a defect in the product itself**.

*Id.* at *8-*10 (emphasis added); *see also* Section III.B.1 & fn. 7, *supra* (explaining that none of Lot #9133 was manufactured for, or reached, HCC). The Court was careful to consider the "reasonable expectations of the insured" and to construe the product contamination policy as a whole. *Ruiz Food*, 2012 WL 4050001, at *10. In this regard, the Court confirmed the obvious, but critically important, fact that the product contamination policy "covered the product" and that "[s]ome defect in the product itself is required to trigger coverage. Some taint in the product itself is required to trigger coverage. The 'potential' of a defect in product does not 'impair' the product itself." *Id.* at *10-*11 ("A potential of a defect in the product is insufficient. The mere possibility that a product may contain a contaminate does not trigger coverage.").

*Ruiz Food* is not alone. In *Little Lady*, the Court likewise rejected a policyholder's attempt to re-write an essentially identical accidental product contamination policy "to require a likelihood that a product is contaminated" rather than "a likelihood that the contaminant it does

10

contain is dangerous." *Little Lady Foods, Inc. v. Houston Cas. Co.*, 819 F. Supp. 2d 759, 762-763 (N.D. Ill. 2011) (emphasis added). In rejecting this attempted rewrite, the Court found HCC's position that there was no "accidental product contamination" because "none of [the policyholder's] products were ever actually contaminated with harmful bacteria" to be the "**only . . . reasonable**" interpretation. *Id.* (emphasis added). In particular, the Court noted that the Policy was only "meant to cover" the costs of "remedying contamination," not the costs of preventing it, and considered "whether the product **actually contained a dangerous contaminant**." *Id.* (emphasis added).

The same result is, of course, appropriate here since none of HCC's products have been found to contain a taint, defect, or a contaminant of any kind.

> **2. Wornick's Arguments Also Ignore the Policy's Requirements That Any Contamination or Impairment Must (1) Be Accidental or Unintentional and (2) Occur During the Manufacturing Process.**

The failure to show a taint, defect, or contaminant of any kind in its PRODUCTS, however, is not the only problem with Wornick's attempt to create coverage. This is because the same words and phrases that form the definition of ACCIDENTAL PRODUCT CONTAMINATION (including the requirement that any contamination or impairment: (1) be accidental or unintentional; and (2) occur during the manufacturing process) not only give context and meaning to the terms "contamination" and "impairment" but also impose independent requirements that Wornick must meet to establish coverage.[10] Wornick's argument

---

[10] In light of this Policy language, Wornick's argument that it bought "impairment coverage" and that "impairment" (or for that matter, "contamination") can – in and of itself – trigger coverage is completely misplaced. (*Compare, e.g.*, Doc. 24, "Analysis," Section I.A, at PAGEID#: 635-636 (apparently also seeking to shift the burden to HCC) *with* Doc. 20-3, Ex. 5, Section 2, Scope of Coverage & Definitions, at PAGEID#: 207 & 209.)

11

that a recall created "contamination" and "impairment," however, cannot meet these requirements; therefore, there is no coverage.

### a. The Plainview Recall Was Neither "Accidental" Nor "Unintentional."

To begin with, Wornick's argument that the Plainview Recall created "contamination" and "impairment" fails because the Plainview Recall was an intentional decision, made (right or wrong) after careful consideration. Since an intentional decision cannot be accidental or unintentional, Wornick's argument that the Plainview Recall created "contamination" and "impairment" cannot meet the definition of ACCIDENTAL PRODUCT CONTAMINATION, which requires "**accidental** or **unintentional** contamination [or] impairment . . . ." (Doc. 20-3, Ex. 5, Section 2, Definitions, at PAGEID#: 209.) Since there was no ACCIDENTAL PRODUCT CONTAMINATION, there is no coverage.

### b. Nor Did It Occur "During the Manufacturing Process."

Likewise, Wornick's argument that the Plainview Recall created "contamination" and "impairment" fails because this alleged "contamination" or "impairment" of Wornick's PRODUCTS did not occur during the manufacturing process.[11] This is because the dairy shakes Wornick now claims were "contaminated" or "impaired" were shipped to Wornick months before the Plainview Recall. (Ex. 9, attached hereto, at Undisputed Fact No. 16.) Moreover, the dairy shakes were "used in the MREs from 11/13/2007 to 05/19/2009." (*Id.*) This was the manufacturing process – and there was no contamination or impairment of any kind found on

---

[11] Wornick asserts that it is HCC's position that "the actual contamination must occur at the plant itself." (Doc. 24 at PAGEID#: 639, fn.9.) That is inaccurate. HCC's position tracks the Policy's language, which requires, among other things, that any "contamination" or "impairment" occur during the manufacturing process (i.e., "during the manufacture, blending, mixing, compounding, packaging, labeling, preparation, production or processing (or storage on the premises of the Named Insured"). (Doc. 20-3, Ex. 5, Section 2, Definitions, at PAGEID#: 209.)

12

Wornick's PRODUCTS throughout this process. The Plainview Recall, however, occurred both after (on June 23, 2009), and outside of, the manufacturing process.[12] Since before there can be coverage there must be an ACCIDENTAL PRODUCT CONTAMINATION, which requires that any contamination or impairment occur during the manufacturing process, there is no coverage.

Indeed, this is the same conclusion reached in *Caudill Seed*, another case where a policyholder sought coverage under identical policy language after contamination at one of the policyholder's upstream suppliers led to a recall. *Caudill Seed & Warehouse Co., Inc. v. Houston Cas. Co.*, 835 F. Supp. 2d 329, 333-335 (W.D. Ky. 2011). In denying coverage, Chief Judge McKinley recognized, just as the Court should here, that the alleged "contamination or impairment did not occur during the manufacturing process" and, consequently, that the insured's claim was not covered, notwithstanding the recall and the possibility of contamination. *Id.*

### C. Wornick's Opposition Simply Rehashes Its "PUBLICITY" Arguments And Fails To Grapple With Critical Policy Language.

In addition to arguing that the Plainview Recall created "contamination" and "impairment," Wornick's Opposition (and its Motion for Summary Judgment) assert three sources of PUBLICITY: (1) ALFOODACT ("AFA") 131 (dated July 1, 2009); (2) AFA 139 (dated August 12, 2009); and (3) a DLA document updated September 30, 2009. (Doc. 24,

---

[12] In this vein, Wornick also claims that its MREs became impaired "during the manufacturing and production process" because "[i]t was during this process that the recalled Dairy Shakes were incorporated into Wornick's MREs, thereby diminishing their value and quality." (Doc. 24, "Analysis," Section I.C, at PAGEID#: 638; *id.* at 639 (asserting that the alleged "contamination" or "impairment" occurred "during the manufacturing and production process" when the MREs "incorporated the Dairy Shakes").) Of course, this argument ignores that the dairy shakes, and MREs, did not actually have anything wrong with them during the manufacturing or production process. To the contrary, they passed stringent and extensive testing, and were sold and shipped to Wornick's customer, the U.S. Military. (Ex. 9, attached hereto, at Undisputed Facts Nos. 14-16, 27-28; *see also* Doc. 22-28, Ex. BB.) It was only after all of this – and outside of the manufacturing process – that the Wornick's alleged "contamination" and "impairment" occurred as a result of the Plainview Recall.

13

"Analysis," Section I.D, at PAGEID#: 639-643; Doc. 22-29, "Analysis," Section II.A, at PAGEID#: 598-601.)[13] Wornick's arguments for PUBLICITY, however, mirror the arguments raised in Wornick's Motion for Summary Judgment; consequently, in response, HCC incorporates Section III.D of its Opposition to Wornick's Motion for Summary Judgment. (*See* Doc. 25, Section III.D, at PAGEID#: 685-689; *compare also* Doc. 24, "Analysis," Section I.D, at PAGEID#: 639-643 *with* Doc. 22-29, "Analysis," Section II.A, at PAGEID#: 598-601.)[14] HCC emphasizes that there can be no coverage based on AFA 131, AFA 139, or the DLA Document because these documents are not PUBLICITY, and because the Policy only extends coverage for LOSS "**resulting directly**" from PUBLICITY – not a recall, as in this case. (*See* Doc. 20-3, Ex. 5, Section 2, Scope of Coverage, at PAGEID#: 207 (emphasis added).)

---

[13] With regard to three other documents, (1) Plainview's June 23, 2009 Product Recall, (2) Franklin Farms' June 25, 2009 letter to Trans-Packers, and (3) Trans-Packers' June 26, 2009 Product Recall, Wornick drops a footnote argument that "the Policy does not state that this 'identification requirement' applies to non-governmental publications." (Doc. 24 at PAGEID#: 640, fn.6.) The Policy, however, says nothing about "non-governmental publications"; instead it refers to media and governmental publications, and none of these documents fits into either category. (*See* Doc. 25 at PAGEID#: 687-689.) Moreover, the requirement in the definition of PUBLICITY that "the Named Insured's PRODUCT(S) and the Named Insured [be] specifically named" applies to both alleged media and governmental publications. (Doc. 20-3, Ex. 5, Section 2, Definitions.) Finally, Wornick's alleged losses resulted from the recall itself, not the documents discussing the recall; consequently, none of Wornick's alleged losses "result[ed] directly" from these documents. (Doc. 20-3, Ex. 5, Section 2, Scope of Coverage.)

[14] Wornick did not mention the DLA Document as a possible source of PUBLICITY in its initial discovery responses; consequently, HCC did not address this document in its Motion for Summary Judgment. (*Compare* Doc. 24-3, Response to Interrog. No. 18 *with* Doc. 24-3 at Response to Interrog. No. 18 (supplemental discovery responses).) Presumably Wornick's reason for now asserting that the DLA Document is PUBLICITY is that this document was included in claims adjuster Michael Tocicki's initial report. In this regard, however, Wornick repeatedly distorts Mr. Tocicki's position regarding the DLA Document, and Mr. Tocicki's role in the claims process. In particular, Wornick asserts that: (1) "HCC knew that publicity coverage was triggered – its loss adjuster noted as much – but ignored it"; and (2) "HCC's own loss adjuster, Michael Tocicki, recognized that the DLA Report constituted 'publicity' under the Policy." (Doc. 24 at PAGEID#: 633, 642.) All that Mr. Tocicki noted was that "it appears possible that an Accidental Product Contamination, as defined, has occurred (due to the policy Publicity clause)." (Doc. 23, Ex. N, at PAGEID#: 629.) Further, Wornick fails to mention that Mr. Tocicki never (with regard to any claim) made the ultimate decision as to whether there was coverage and, with regard to this claim, Mr. Tocicki concluded that recommending coverage was beyond the scope of his responsibility and expertise; consequently, the entire matter was referred to outside counsel to conduct a coverage analysis. (*See, e.g.*, Doc. 22-13, Ex. L, at 89:13-24, 101:13-25, 102:1-17; Doc. 22-12, Ex. K, at 23:18-25 & 24:1-7.) After this coverage analysis, HCC determined that there was no coverage. (*See generally* Doc. 22-15, Ex. O (noting among other things, with regard to PUBLICITY, that "**the insured did not sustain a Loss as a result of any Publicity implying an Accidental Product Contamination**" (emphasis in original)).)

### D. Wornick Has Not Shown That Consumption or Use of Its Product Either Resulted, or May Likely Result, in Sickness, Disease, or Death.

Wornick also misunderstands the Policy's "consumption or use" requirement. (Doc. 20-3, Ex. 5, Section 2, Definitions, at PAGEID#: 209; *see also* Doc. 25, Section III.G.) In particular, Wornick claims that "HCC argues that salmonella contamination would not satisfy this requirement." (Doc. 24, "Analysis," Section I.E., at PAGEID#: 643.) That is not, however, what HCC argues (or what the Policy requires). The issue in this case is not whether sickness may likely result from salmonella contamination, but rather whether sickness may likely result from the consumption or use of Wornick's CONTAMINATED PRODUCTS.[15] The answer is that it was never likely that any sickness would result from the consumption or use of Wornick's products because the Plainview Recall was completely prophylactic. This was confirmed not only by Trans-Packers and Wornick's customer, the U.S. Military, but also by Wornick's Chief Financial Officer, Dustin McDulin, and by Wornick's attorney in his representations (on Wornick's behalf) to the U.S. Military. (Doc. 20-1, Section III.C.4, at PAGEID#: 155-156.)[16]

---

[15] Of course, there were also no CONTAMINATED PRODUCTS because, as explained, none of Wornick's PRODUCTS "have been the subject of an ACCIDENTAL PRODUCT CONTAMINATION." (*See* Doc. 20-3, Ex. 5, Section 2, Definitions, at PAGEID#: 210.)

[16] Wornick asserts that the fact that "there have been no reported instances of bodily injury, sickness, disease, or death that resulted from the consumption or use of Wornick's products" is "of no significance" because "the retrieval and rework ensured that this would not happen" is misleading. (Doc. 24, "Analysis," Section I.E, PAGEID#: 644.) However, Lester Weiss, Trans-Packers' Chief Operating Officer, testified that "to our best knowledge, and FDA bulletins, notwithstanding the **many hundreds of thousands** of Dairy Shake blends actually consumed by the U.S. military personnel during the 2-year period covered by the recall, no illnesses have been reported to date." (Doc. 20-3, Ex. 1, at ¶ 18 (emphasis added); *see also* Ex. 9, attached hereto, at Undisputed Fact No. 28.) Wornick has offered no evidence to the contrary.

15

### E.     Under Any Applicable Law, There Is No Basis For Wornick's Bad Faith Claim.

All of the foregoing establishes not only that there is no coverage, but also that there is no basis for Wornick's bad faith claim. This is true under either New York or Ohio law.[17] As an initial matter, not only is HCC's position reasonable, it is also correct; consequently, there is no coverage, and there can be no claim for bad faith absent coverage. *Retail Ventures, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 691 F.3d 821, 634 (6th Cir. 2012); *see also New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 662 N.E.2d 763, 767-770 (1995). The correctness (and reasonableness) of HCC's position is confirmed by both the Policy language and the numerous courts that have reached the same conclusion in closely analogous circumstances. *See Ruiz Food*, 2012 WL 4050001, at *14-*15 (rejecting the policyholder's bad faith claim); *Little Lady*, 819 F. Supp. 2d at 764 (same); *Caudill Seed*, 835 F. Supp. 2d at 332 & 336.

Moreover, and as demonstrated by the numerous documents and extensive deposition testimony filed by Wornick, HCC and its representatives conducted a thorough, careful, and

---

[17] The Court should apply New York law to Wornick's bad faith claim (as opposed to its contract claim). *In re Commercial Money Ctr., Inc., Equip. Lease Litig.*, 603 F. Supp. 2d 1095, 1103, 1107-08 (N.D. Ohio 2009). In particular, bad faith under Ohio law is a tort and, consequently, the Court should look to the state with the most significant relationship based on multiple factors, including: (a) the needs of the interstate and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (d) the protection of justified expectations; (e) the basic policies underlying the particular field of law; (f) certainty, predictability and uniformity of result; and (g) ease in the determination and application of the law to be applied. Restatement (Second) of Conflict of Laws, § 6. Further, in applying these principles, the Court should consider: (a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicil, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered. *Id.* at § 145. Since a bad faith action is not one for "personal injury," the location of the alleged injury is not controlling. *Id.* at § 146. Nor should it be, because the other factors point to New York. In particular, a bad faith claim is designed to regulate the conduct of an insurer and its representatives. Wornick purchased a Policy through underwriters (William Kidder of Professional Indemnity Agency, Inc.) based in New York. The entire claims process was overseen by Professional Indemnity Agency, Inc.'s claims department in New York, which retained New York counsel to assist HCC in evaluating coverage. And, indeed, Wornick pursued its claim through a representative based in New Jersey (William Harrison). Since the parties' relationship was centered in New York and Wornick's bad faith claim is aimed at regulating conduct that took place in New York, the law of New York should apply. Moreover, Wornick does not dispute that, if New York law applies, there is no tort for bad faith.

more than reasonable examination and analysis of Wornick's claim before issuing multiple denials letters. (*See, e.g.*, Doc. 23, Ex. N (Tocicki Report No. 1), Doc. 22-15, Ex. O (June 2, 2010 letter), Doc. 22-16, Ex. P (June 24, 2010 letter), Doc. 22-17, Ex. Q (Oct. 27, 2010 letter), Doc. 22-26, Ex. Z (Nov. 5, 2010 letter), Doc. 22-18, Ex. R (Tocicki Report No. 2); Doc. 22-19, Ex. S (Jan. 25, 2011 letter); *see also* Doc. 22-12, Ex. K (Smith Dep.); Doc. 22-13, Ex. L (Tocicki Dep.).) In short, there simply is no basis for Wornick's bad faith claim.

## IV. CONCLUSION

Wornick's Complaint contains three counts: (1) "Count I – Declaratory Judgment"; (2) "Count II – Breach of Contract"; and (3) "Count III – Bad Faith." Wornick, however, has not established coverage, much less a claim for bad faith. Consequently, Defendant Houston Casualty Company respectfully requests that, pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, the Court grant it summary judgment denying Wornick's claims for breach of contract and bad faith and, further, declare that there is no coverage afforded to Wornick under the Policy.

Respectfully submitted,

*s/ Kevin M. Young*
Kevin M. Young (0029715)
Karl A. Bekeny (0075332)
Jesse W. Thomas (0085253)
TUCKER ELLIS LLP
925 Euclid Avenue, Suite 1150
Cleveland, OH 44115-1414
Telephone: 216.592.5000
Facsimile: 216.592.5009
E-mail: kevin.young@tuckerellis.com
karl.bekeny@tuckerellis.com
jesse.thomas@tuckerellis.com

*Attorneys for Defendant*
*Houston Casualty Company*

17

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 9, 2012 a copy of Defendant Houston Casualty Company's **Reply in Support of Its Motion for Summary Judgment** and **Final Statement of Undisputed Facts** was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Respectfully submitted,

*s/ Kevin M. Young*
Kevin M. Young (0029715)
Karl A. Bekeny (0075332)
Jesse W. Thomas (0085253)
TUCKER ELLIS LLP
925 Euclid Avenue, Suite 1150
Cleveland, OH 44115-1414
Telephone:   216.592.5000
Facsimile:    216.592.5009
E-mail:         kevin.young@tuckerellis.com
                    karl.bekeny@tuckerellis.com
                    jesse.thomas@tuckerellis.com

*Attorneys for Defendant*
*Houston Casualty Company*