IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| THE WORNICK COMPANY,<br><br>      Plaintiff,<br><br>vs.<br><br>HOUSTON CASUALTY COMPANY<br><br>      Defendant. | CASE No. 1:11-CV-391-SJD<br><br>CHIEF JUDGE SUSAN J. DLOTT |

## THE WORNICK COMPANY'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff, The Wornick Company ("Wornick"), submits this reply memorandum of law in support of its motion for partial summary judgment against Defendant, Houston Casualty Company ("HCC").[1]

## INTRODUCTION

HCC's incessant use of the term "recall" does not disprove that Wornick suffered an Accidental Product Contamination, triggering coverage under the Policy. During the MRE manufacturing process, Wornick incorporated Dairy Shakes that were made with non-fat dry milk ("NFDM") subject to recall as a result of salmonella contamination in Wornick's supply chain. It was at this point that Wornick's MREs were both contaminated and impaired, triggering coverage under the Policy. The Policy was also triggered, separately, because the Government published reports of the contamination incident, thus triggering the Policy's publicity coverage. DLA published on the internet two ALFOODACTs reporting the

---

[1] The defined terms in this memorandum have the same meaning as in Wornick's opening memorandum [D.E. 22-29] and memorandum in opposition to HCC's motion for summary judgment [D.E. 24]. The aforementioned memoranda are incorporated herein by reference along with Wornick's Statement of Proposed Undisputed Facts [D.E. 22-1].

contamination incident, naming Wornick and its MREs, and ordering that the Dairy Shakes not be consumed. The Government also published an article on the internet naming Wornick and its MREs and implying that a contamination or impairment had taken place. These incidents of publicity resulted in losses to Wornick and are covered. Wornick has proven that it is entitled to insurance coverage as a matter of law, and its motion for partial summary judgment should be granted.

**ANALYSIS**

**I.     THE CONTAMINATION INCIDENT TRIGGERED THE POLICY'S PUBLICITY COVERAGE**

**A.     Wornick's Losses Resulted Directly From Publicity**

Although HCC contends otherwise, Wornick's losses resulted directly from an Accidental Product Contamination in the form of publicity. ALFOODACTs 131-2009 and 139-2009 and the DLA report contributed to Wornick's losses. ALFOODACTs 131-2009 and 139-2009, for instance, required that "DLA controlled MRE ... will be reworked" and stated that certain MREs are subject to the DO NOT CONSUME ORDER. Exs. F, H to SOF. For this reason, and at the Government's insistence, Wornick was required to bear the cost of retrieving from the Government (i.e., DLA's control), and reworking, 700,000 MREs. These MREs could not be consumed as originally manufactured, as indicated in both ALFOODACTs, causing Wornick losses. Similarly, the DLA article orders against consumption of the Dairy Shakes. Ex. I to SOF.

Neither the ALFOODACTs nor the DLA article is addressed exclusively to end users or consumers. Rather, they were disseminated widely on the internet. Since the aforementioned publicity required the rework and prohibited Wornick's product from being consumed, a causal link between Wornick's losses and the aforementioned publicity exists

2

satisfying the Policy's requirements. There is no material fact as to the causation of Wornick's losses and summary judgment should enter.[2]

**B.     ALFOODACTs 131-2009 And 139-2009 And The DLA Report Meet The Publication Requirement**

For a report to trigger "publicity" coverage, it must be (1) "in local, regional or national media (including but not limited to radio, television, newspapers, magazines or the Internet) or [2] any governmental publication where the Named Insured's PRODUCT(S) and the Named Insured are specifically named." SOF ¶ 10. For all three reports, the publication requirement is clearly met using either prong (1) or (2).

HCC does not dispute that all three reports were published on the internet. See D.E. 25 at 10 (wherein HCC admits that the reports were published on the internet). The Policy expressly recognizes the internet as a media forum. HCC's new argument that a document placed on the internet is not designed to reach the public or the "mass of the people" simply does not make sense. It is questionable whether a better way to make something generally known exists than to put it on the internet where it is universally and freely available to all. Furthermore, HCC's reference to extrinsic evidence – when the Policy specifically defines the term "media" to include the "internet" – violates settled policy construction principles prohibiting the use of extrinsic evidence when a policy provision is clear and unambiguous. Therefore, the Court's inquiry into the publication requirement can end with (1) an examination of the Policy's clear statement that the media includes the internet and (2) the undisputed fact that these reports were published on the internet.

---

[2] HCC's interpretation of the Policy's publicity coverage – which it alleges is triggered by only the first document to mention the recall – is so narrow that it renders the coverage worthless.

The three aforementioned reports are also governmental publications because – simply stated – the Government published them.  The DLA, which is part of the Department of Defense, published ALFOODACTs 131-2009 and 139-2009 and the DLA article.[3]  Since the publication requirement is met, HCC has failed to raise a genuine issue of material fact and Wornick's motion should be granted.

## II.     WORNICK'S MRES WERE SUBJECT TO AN ACCIDENTAL OR UNINTENTIONAL IMPAIRMENT AND CONTAMINATION, TRIGGERING COVERAGE UNDER THE POLICY

### A.     The Impairment Of Wornick's MREs Occurred During The Manufacturing Process

HCC disputes neither Wornick's interpretation of the term "impairment," nor that Wornick's MREs were impaired.  HCC disputes only the timing of the impairment.  In arguing (incorrectly) that the Plainview recall caused the impairment and contamination of Wornick's MREs, HCC admits that Wornick's MREs were impaired, stating "[i]t is the Plainview Recall that made Wornick's PRODUCTS … less likely to be sold or consumed and, consequently, decreased their value." D.E. 25 at p. 14.

Contrary to HCC's attempts to reframe Wornick's arguments, impairment of Wornick's MREs occurred during the manufacturing and production process and not during the Plainview recall.  It was during Wornick's manufacturing process that the recalled Dairy Shakes were incorporated into Wornick's MREs, thereby diminishing their value and quality.  From the moment that Wornick's MREs contained this defective product, they were "impaired" – meaning, less likely to be sold or consumed.

---

[3] See http://www.dla.mil/pages/about_dla.aspx (stating that "[t]he Defense Logistics Agency is the Department of Defense's largest logistics combat support agency").

4

B.      **The Contamination Of Wornick's MREs Occurred During The Manufacturing Process**

HCC maintains that Wornick's MREs were not contaminated during the manufacturing process because – it claims – there was no actual contamination. HCC now contends that the Policy requires a positive salmonella test result to trigger coverage. HCC could have, but did <u>not</u>, put this requirement in the Policy. It also could have defined the term "contamination," but chose not to.

It was during the manufacturing process that the defective Dairy Shakes were incorporated into Wornick's MREs, contaminating them. Furthermore, HCC's argument is based on a fundamental misconception. The absence of a positive test result in the retrieved MREs does not indicate that they were salmonella free. Hyche Decl. ¶¶ 6-7, 10.[4] In fact, the Government did not believe they were salmonella free, published reports implying that they were contaminated, issued orders against their consumption, and required Wornick to retrieve and rework them at Wornick's cost. The Dairy Shakes in Wornick's MREs were (1) not tested when they were brought back to Wornick and (2) subject only to random testing at Trans-Packers of about 5 Dairy Shakes in lots of up to 60,000 Dairy Shakes. Hyche Decl. ¶¶ 9-12. Even then, the negative test result of several Dairy Shake packets does not indicate the absence of salmonella in all lots of Dairy Shakes. <u>Id.</u> at ¶ 10.

C.      **The Impairment And Contamination Of Wornick's MREs Was Accidental And Unintentional**

The Policy requires that the impairment or contamination be "accidental" or "unintentional." SOF ¶ 6. No doubt exists that this requirement is met here and HCC fails in proving otherwise. Salmonella caused the impairment and contamination of Wornick's MREs.

---

[4] "Hyche Decl." refers to the Declaration of Michael Hyche in Support of the Wornick Company's Motion for Partial Summary Judgment against Houston Casualty Company, executed on November 9, 2012.

nydocs1-998411.6

The salmonella contamination and the resulting impairment of Wornick's MREs (i.e., their diminishment in value and quality) were accidental and unintentional because no evidence exists that anyone purposefully inserted salmonella into Wornick's supply chain.

HCC's argument that the impairment and contamination of Wornick's MREs was purposeful is incredulous and nonsensical. The issuance of Plainview's recall did not cause Wornick's MREs to be contaminated or impaired. Rather, salmonella caused the contamination and impairment. No evidence whatsoever exists to support HCC's latest attempt to avoid paying Wornick under the Policy.

## III. BECAUSE WORNICK'S MRES DID NOT MEET DESIGN SPECIFICATIONS, COVERAGE WAS TRIGGERED UNDER THE POLICY

HCC's argument that Wornick's MREs met design specifications because Wornick said so in a letter to the Government arguing that it should not bear the cost of the rework and retrieval is unpersuasive. HCC is basically arguing that Wornick's attempt to mitigate damages resulted in Wornick forfeiting coverage. The Government was not persuaded by Wornick's argument, as Wornick did, in fact, have to bear the cost of the rework and retrieval. Wornick's contract with the Government required that the MREs be salmonella free. They did not meet this design specification.

## IV. THE MANIFESTATION PERIOD REQUIREMENT HAS BEEN MET

The manifestation period requirement has been met because Wornick's MREs ***"may likely result"*** in physical symptoms of bodily injury, sickness, disease, or death. The manifestation period requirement, contrary to HCC's contentions, does not require actual proof of contamination, but only a likelihood of bodily injury, sickness, disease, or death. SOF ¶ 6. Certainly such a likelihood existed with regard to MREs that (1) were subject to four Do Not Consume Orders; (2) the Government ordered be retrieved and reworked; (3) contained NFDM

6

that was subject to notices of recall by Plainview and Franklin; and (4) contained Dairy Shakes that were subject to recall by Trans-Packers.

"Contamination," "impairment," "publicity," and "fault in design specification" coverage require "that the consumption or use of the Named Insured's CONTAMINATED PRODUCT(S) has, within 120 days of such consumption or use, either resulted, or may likely result, in: (1) physical symptoms of bodily injury, sickness, or disease or death of any person(s)…" SOF ¶ 6 (emphasis added). "CONTAMINATED PRODUCT(S)" are not, as HCC would have it, simply the Named Insured's products that have been subject to a contamination, but "[t]he Named Insured's PRODUCT(S) which have been the subject of an ACCIDENTAL PRODUCT CONTAMINATION," which includes, "a contamination, impairment … or PUBLICITY imply such." SOF ¶ 8 (emphasis added).[5] Explaining this "manifestation period" requirement, HCC's underwriter testified: "the contamination or impairment or whatever it is has to be of such a nature that if you were to consume the product, you would or may likely become ill within 120 days of having consumed it." Ex. M to SOF at 62:10-16 (emphasis added).

It is undisputed that salmonella contamination may cause physical symptoms of bodily injury, sickness, disease, or death of persons. See Ex. N to SOF at 15 (where HCC's loss adjuster notes that "salmonella is a potentially fatal bacterium" and cites to the Center for Disease Control's statement that salmonella can cause death) (citing http://www.cdc.gov/salmonella/general/index.html). Furthermore, a Class 1 Recall, as was put into effect here, by definition, implies this potential for sickness or death. See SOF ¶ 30

---

[5] Consistent with the manifestation period requirement's use of the term "likely," publicity coverage does not require proof of actual contamination. HCC admitted as much at deposition. SOF ¶ 105.

nydocs1-998411.6

(defining Class 1 Recall as "a situation in which there is a reasonable probability that the use of or exposure to a violative product will cause serious adverse health consequences or death").

In this case, Wornick's MREs contained NFDM that was recalled because of salmonella contamination detected in Wornick's supply chain at Trans-Packers and Plainview. SOF ¶¶ 18-20, 24, 37, 45.  On account of the positive salmonella tests in Trans-Packers' product and on Plainview's equipment, Plainview, Franklin, and Trans-Packers' all issued recall notices. Additionally, the Government issued four ALFOODACTs, ordering that the Dairy Shakes not be consumed, and required Wornick to rework and retrieve the MREs.  Given these circumstances, one may reasonably conclude that the consumption of Wornick's MREs may likely have resulted in physical symptoms of bodily injury, sickness, or disease or death of a person.

Relying on the self-serving and untested Declaration of Lester Weiss – Trans-Packers' Chief Operating Officer – submitted in defending a lawsuit that Wornick brought against Trans-Packers, HCC argues that the Dairy Shakes were not contaminated because Trans-Packers tested each lot before shipping it to Wornick and there were no positive results.  HCC's conclusion is both (1) an inappropriate proffer of expert testimony by counsel and (2) scientifically incorrect.  Significant differences existence between:  (1) a negative salmonella test and a "salmonella free" product and (2) a negative test of a lot and a negative test of each Dairy Shake.  One food safety writer succinctly noted the difference:

> Salmonella contamination will not normally be uniform within a lot of ingredients or mixed feed or pet food.  Hence, an otherwise representative sample of the feed material may not actually be representative regarding the absence of Salmonella.  This being the case, analytical results showing no salmonella present are described as "salmonella negative, as tested" rather than "salmonella free, as tested."  By contrast, positive analytical results of properly secured and analyzed samples do indicate

contamination. This important distinction should be kept in mind when interpreting analytical results.[6]

Based on this information, HCC's argument is scientifically flawed. The negative test result of a lot or one particular Dairy Shake does not mean that each Dairy Shake would have tested negative because salmonella contamination is not uniform in nature. By the same token, the negative test result of a lot or a Dairy Shake does not indicate the lot or Dairy Shake is salmonella free. HCC has failed to raise a question of material fact as to the satisfaction of the manifestation period requirement, and Wornick's motion should be granted.[7]

## V.     HCC HAS NOT RAISED A GENUINE ISSUE OF MATERIAL FACT CONCERNING DAMAGES

Wornick does not dispute that the summary judgment motions before this Court pertain to the issue of liability and not damages. However, HCC's bald statement that there exists a genuine issue of material fact as to damages is incorrect. HCC has submitted no admissible evidence disputing the nature or quantity of Wornick's damages, and therefore, has raised no such issue of fact.[8]

---

[6] See Ex. DD to the Declaration of Anna M. Piazza submitted herewith and executed on November 9, 2012.

[7] HCC also relies on an email by Wornick's Chief Financial Officer, and a letter by Wornick's attorneys to the Government, both of which set forth Wornick's arguments to the Government explaining why it should not have to bear the cost of the MRE retrieval and rework. These arguments, like Mr. Weiss' Declaration, rely on negative test results of Dairy Shake pouches in lots of Dairy Shakes, which do not indicate the Dairy Shakes were "salmonella free."

[8] In response to Wornick's Statement of Proposed Undisputed Facts, HCC challenges the authenticity of many documents which it has previously reviewed and upon which it relied in denying coverage. For instance, it challenges the authenticity of the Policy, the ALFOODACTs, and the DLA report. HCC never raised questions as to the authenticity of these documents when making its coverage decision. In any event, Wornick contends that many of these documents are business records and/or self-authenticating documents, or otherwise can be authenticated at trial.

nydocs1-998411.6

## CONCLUSION

For the aforementioned reasons, and the reasons set forth in Wornick's principal brief, the Court should grant Wornick's motion for partial summary judgment as to Count I and II of its complaint.

Dated:    November 9, 2012

By:    /s/ Gregory A. Harrison

Gregory A. Harrison, Bar No. 0029814

Steven J. Pudell (admitted pro hac vice)          DINSMORE & SHOHL LLP
ANDERSON KILL & OLICK, P.C.                        1900 Chemed Center
One Gateway Center                                 255 East Fifth Street
Suite 1510                                         Suite 1900
Newark, NJ  07102                                  Cincinnati, OH 45202
T: 973-642-5858                                    T: 513-977-8200
F: 973-621-6361                                    F: 513-977-8141
spudell@andersonkill.com                           greg.harrison@dinsmore.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 9, 2012, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the below-listed trial counsel:

Kevin M. Young
Karl A. Bekeny
Jesse W. Thomas
TUCKER ELLIS & WEST LLP
925 Euclid Avenue, Suite 1150
Cleveland, OH  44115-1414

/s/ Gregory A. Harrison
Gregory A. Harrison
DINSMORE & SHOHL LLP
1900 Chemed Center
255 East Fifth Street, Suite 1900
Cincinnati, OH 45202
P: 513.977.8314
F: 513.977.8141

nydocs1-998411.6