**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **THE WORNICK COMPANY,** | : | |
| | | Case No. 1:11-CV-00391 |
| Plaintiff, | : | |
| | | Chief Judge Susan J. Dlott |
| v. | : | |
| | | **ORDER** |
| **HOUSTON CASUALTY COMPANY,** | : | |
| | | |
| Defendant. | : | |

Plaintiff, the Wornick Company ("Wornick"), filed suit against its insurer, Houston

Casualty Company ("Houston Casualty"), claiming breach of contract and bad faith and seeking

a declaration of coverage for costs associated with a product recall.  Houston Casualty moves for

summary judgment on all three counts.  Doc. 20.  Wornick moves for partial summary judgment

on the breach of contract and declaratory judgment claims.  Doc. 22.  For the following reasons,

both motions are **DENIED**.

**I.      BACKGROUND**

Unless otherwise noted, the following facts are drawn from the parties' statements of

proposed undisputed facts.  *See* Doc. 20-2 and Doc. 22-1.

**A.  Wornick's Business**

Wornick is a leading supplier of convenience foods and military rations to the U.S.

Government.  Compl. ¶ 1, Doc. 1 at Page ID # 1.  Wornick acts as a supply-chain integrator or

assembler of operational rations called meals-ready-to-eat ("MRE") on behalf of the U.S.

Government and the Department of Defense (collectively, the "Government").  As a supply-

chain integrator, Wornick purchases the component items for MREs from manufacturers, consolidates them into a final MRE package, and sells them to the Government.

Wornick's MREs include dairy shake packets that are manufactured by Trans-Packers Services Corp. ("Trans-Packers").  At all relevant times, the dairy shake packets contained instant non-fat dried milk ("NFDM") that Trans-Packers purchased from Franklin Farms East, Inc. ("Franklin Farms").  Franklin Farms, in turn, purchased the NFDM from Plainview Milk Products Cooperative ("Plainview").

### B.  Salmonella Contamination and Recall of Dry Milk Products, Dairy Shakes, and MREs.

On or about May 28, 2009, salmonella contamination was found in Lot #9133 of dairy shake packets at Trans-Packers' facilities in New York.  After the finding, the Federal Drug Administration ("FDA") began an investigation, testing for salmonella contamination.  The FDA found salmonella in one other place—on manufacturing equipment at Plainview's facilities in Minnesota.

On June 23, 2009, Plainview issued a voluntary recall for NFDM products produced at its facility since June 4, 2007 (the "Plainview recall").  On June 25, 2009, Franklin Farms transmitted a recall notice to Trans-Packers, which stated that Plainview had issued a recall of the NFDM products.  On June 26, 2009, Trans-Packers transmitted a recall notice to Wornick.  Trans-Packers issued its own recall of the dairy shake packets on July 7, 2009.  The recalled dairy shake packets were shipped to Wornick between October 23, 2007 and December 2, 2008, and were used in the MREs from November 13, 2007 to May 19, 2009.

2

Beginning June 26, 2009, the Government issued a series of three ALFOODACT "Do Not Consume" orders with respect to the dairy shake packets.[1]  *See* Wornick's Mot. Summary J. Ex. E, Doc. 22-6 at Page ID # 278 (issued June 26, 2009); *id*. Ex. F., Doc. 22-7 at Page ID # 281 (issued July 1, 2009); *id*. Ex. H, Doc. 22-9 at Page ID # 289 (issued August 12, 2009).  The Do Not Consume orders issued on July 1, 2009 and August 12, 2009 specifically name Wornick's MREs.  On September 30, 2009, the Defense Logistics Agency (the "DLA") published an article entitled "Operational Rations, Dairyshake Powder, Recall Information Page" (hereinafter, the "DLA report") which described the circumstances of the contamination incident and specifically named Wornick and the MREs.  *Id*. Ex. I, Doc. 22-10 at Page ID # 295.

After the Plainview recall, on or about September 2, 2009, the Government notified Wornick of its intent to invoke a breach of warranty action against Wornick related to the recalled dairy shake packets.  The Government demanded that Wornick bear all costs associated with reworking the MREs, including recalling the MREs, shipping them back to Wornick's

---

[1]  "ALFOODACT" refers to "All Food & Drugs Act."  The "Do Not Consume" orders are issued by the Defense Logistics Agency ("DLA"), an agency within the United States Department of Defense.  Wornick's Mot. Summary J. Ex. V, Doc. 22-22 at Page ID # 555.  Regarding the purpose and distribution of the Do Not Consume orders, the DLA writes:

> The [Department of Defense's] ALFOODACT system is designed to provide worldwide distribution of  [FDA] ... agency recalls and potential recalls of hazardous, tampered or suspected tampering of foods ... that are, or may be expected to be in military accounts. The ALFOODACT message contains specific information and instructions on how to identify and dispose of the product. DLA Troop Support posts all ALFOODACTs to the DLA Troop Support Food Safety Web Page and US Army Veterinary Command's Lotus Notes ALFOODACT database. Additionally, DLA Troop Support emails these alerts to all activities/agencies/individuals, which have requested immediate notification. The ALFOODACTs are also distributed using Defense Messaging Dissemination System.

*Id*.

facility, removing and replacing the recalled dairy shake packets, and re-shipping the MREs to the Government.  Wornick complied, recalling and reworking approximately 700,000 cases of MREs.  Despite extensive testing, no salmonella was ever found in any of Wornick's MREs.  *See* Houston Casualty's Mot. Summary J. Ex. 8, Doc. 20-3 at Page ID # 226-27.  As it turns out, Lot #9133, which tested positive for salmonella at Trans-Packer's New York facility, was not sent to Wornick.  There have been no reports of any physical symptoms of bodily injury, sickness, disease or death from the consumption of Wornick's MREs.

### C.  Wornick's Claim and Subsequent Lawsuit

After recalling and reworking approximately 700,000 cases of MREs, Wornick made a claim to Houston Casualty under its Malicious Product Tampering/Accidental Product Contamination Insurance Policy (the "Policy").  Houston Casualty denied Wornick's claim for coverage, finding that Wornick's losses did not directly result from an "Accidental Product Contamination," as that term is defined in the Policy.

Following Houston Casualty's denial of Wornick's claim under the Policy, Wornick filed this suit.  In its Complaint, Wornick asks the Court to declare that its losses from the recall are covered under the terms of the Policy.  Wornick also alleges that Houston Casualty breached its contract with Wornick and acted in bad faith when it denied coverage.

On September 24, 2012, Houston Casualty moved for summary judgment on all three claims.  As to the breach of contract and declaratory judgment claims, Houston Casualty argues there is no coverage under the Policy because there was no Accidental Product Contamination. As to the bad faith claim, Houston Casualty argues that this claim should fail for the same reasons that the breach of contract and declaratory judgment claims should fail—namely, that there is no coverage under the Policy.  Additionally, Houston Casualty argues that Wornick has

not offered any evidence that Houston Casualty failed to properly investigate the claim or acted unreasonably in processing it.

On September 25, 2012, Wornick moved for partial summary judgment on the declaratory judgment claim and the breach of contract claim. Wornick argues that the Accidental Product Contamination definition was met and, thus, coverage exists, for four reasons: (1) the Policy's publicity coverage was triggered by three Government-issued reports which implied that the MREs were contaminated; (2) the MREs were impaired for purposes of the Policy because the potential salmonella contamination diminished the MREs' value and quality; (3) the MREs failed to meet "product specifications" because they contained dairy shake packets subject to a recall; and (4) the MREs were contaminated or "corrupted by association" because they contained dairy shake packets subject to a recall.

## II. SUMMARY JUDGMENT STANDARD

A court must grant "summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making this determination, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006). The ultimate inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). But "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247–48. A genuine issue for trial exists when there is sufficient "evidence on which the jury

5

could reasonably find for the [nonmoving party]." *Id*. at 252. The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation. *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).

> The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts []. Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.

*Id*. (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)).

## III. ANALYSIS

### A. Policy Interpretation

Under Ohio law,[2] the interpretation of an insurance contract is a question of law. *United Nat'l Ins. Co. v. SST Fitness Corp.*, 182 F.3d 447, 449 (6th Cir. 1999); *Lager v. Miller–Gonzalez*, 120 Ohio St. 3d 47, 896 N.E.2d 666, 669 (2008). "In interpreting the insurance policy, 'words and phrases used in an insurance policy must be given their natural and commonly accepted meaning.'" *United Nat'l Ins. Co.*, 182 F.3d at 449-50 (quoting *United States Fidelity & Guar. Co. v. Lightning Rod Mut. Ins. Co.*, 80 Ohio St. 3d 584, 687 N.E.2d 717, 719 (1997)). "The mere absence of a definition in an insurance contract does not make the meaning of the term ambiguous." *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St. 3d 107, 108, 652 N.E.2d 684, 686 (1995). "However, if provisions are susceptible of more than one interpretation, they must be construed strictly against the insurer and liberally in favor of the insured."

---

[2] The parties agree that Ohio law applies to the declaratory judgment and breach of contract claims.

6

*Schwartz Manes Ruby and Slovin, L.P.A. v. Monitor Liability Managers, LLC*, 483 F. App'x 241,

244 (6th Cir. 2012) (citing *Westfield Ins. Co. v. Hunter*, 128 Ohio St. 3d 540, 948 N.E.2d 931,

935 (2011)).

### B. The Policy

In July of 2008, Houston Casualty issued to Wornick a Malicious Product

Tampering/Accidental Product Contamination Insurance Policy (the "Policy"). Compl. Ex. A,

Doc. 1-1 at Page ID # 14. The Policy covered the period from July 10, 2008 to July 10, 2009.

*Id*. The Policy states that "[t]he Company agrees to indemnify the Named Insured for LOSS

resulting directly from an ACCIDENTAL PRODUCT CONTAMINATION first discovered by

the Named Insured during the Policy Period." *Id*. at Page ID # 17.

The Policy defines "Accidental Product Contamination" as

(1) Any accidental or unintentional contamination, impairment or mislabeling
(including mislabeling of instructions for use) during the manufacture,
blending, mixing, compounding, packaging, labeling, preparation, production
or processing (or storage on the premises of the Named Insured), of the
Named Insured's PRODUCTS[3] (including their components), or PUBLICITY
implying such, or

(2) Fault in design specification or performance of the Named Insured's
PRODUCT(S)

provided always that the consumption or use of the Named Insured's
CONTAMINATED PRODUCT(S)[4] has, within 120 days of such consumption or
use, either resulted, or may likely result, in: (1) physical symptoms of bodily

---

[3] The Policy defines Products as "[a]ll goods or products (finished or in process), including all
ingredients or components thereof, manufactured, distributed, handled by the Named Insured (or
manufactured by a contract manufacturer for the Named Insured) and which are (or will be)
available for sale by the Named Insured." *Id*. at Page ID # 19. The parties do not dispute the
meaning of the word Products

[4] Contaminated Product(s) are "[t]he Named Insured's PRODUCT(S) which have been the
subject of an ACCIDENTAL PRODUCT CONTAMINATION – excluding any in-ground crops,
land and/or livestock." *Id*. at Page ID # 20. The parties do not dispute the meaning of the term
Contaminated Product.

> injury, sickness or disease or death of any person(s) and/or (2) physical damage to (or destruction of) tangible property, including animals and/or livestock – other than PRODUCT(S) of the Named Insured.

*Id*. at Page ID # 19.  Also relevant here, the Policy defines "Publicity" as

> The reporting of an actual or alleged ACCIDENTAL PRODUCT CONTAMINATION during the Policy Period in local, regional or national media (including but not limited to radio, television, newspapers, magazines or the Internet) or any governmental publication where the Named Insured's PRODUCT(S) and the Named Insured are specifically named.

*Id*. at Page ID # 20.

### C. Coverage Issues Under the Policy

Both parties move for summary judgment on the coverage issues (encompassing both the declaratory judgment and breach of contract claims).  The crux of the coverage issues is the interpretation of Accidental Product Contamination as it is defined in the Policy.  Specifically, the parties' motions require the Court to parse through the definition of Accidental Product Contamination in order to resolve the following issues: (i) did the recall of dairy shake packets qualify as a "contamination"; (ii) did the recall of dairy shake packets constitute an "impairment"; (iii) did the inclusion of recalled dairy shake packets in the MREs amount to a "fault in design specification or performance"; and (iv) did the Government's "Do Not Consume" orders and the DLA report trigger the Policy's Publicity coverage.  Additionally, even if Wornick can show contamination, impairment, fault in design specification, or publicity, the Policy also requires a showing that the "consumption or use of the [MREs] has . . . either resulted, or may likely result, in . . . physical symptoms of bodily injury, sickness or disease or death . . . ."  *Id*. at Page ID # 19.  Because both parties have moved for summary judgment, the Court must determine whether disputes remain as to material issues of fact on the coverage issues.

8

### i. Contamination

To recover under the Policy, Wornick must prove that it suffered an Accidental Product Contamination. Again, the Policy defines Accidental Product Contamination as follows:

> (1) Any accidental or unintentional **contamination**, impairment or mislabeling (including mislabeling of instructions for use) during the manufacture, blending, mixing, compounding, packaging, labeling, preparation, production or processing (or storage on the premises of the Named Insured), of the Named Insured's PRODUCTS (including their components), or PUBLICITY implying such, or
>
> (2) Fault in design specification or performance of the Named Insured's PRODUCT(S)
>
> **provided always that** the consumption or use of the Named Insured's CONTAMINATED PRODUCT(S) has, within 120 days of such consumption or use, either resulted, or may likely result, in: (1) physical symptoms of bodily injury, sickness or disease or death of any person(s) and/or (2) physical damage to (or destruction of) tangible property, including animals and/or livestock – other than PRODUCT(S) of the Named Insured.

*Id.* at Page ID # 19 (emphasis added). The Policy does not define the term "contamination." The parties offer differing interpretations.

Wornick suggests a broad definition of the term, citing Merriam-Webster, which defines "contaminate" as "to soil, stain, corrupt, or infect by contact or association." *Webster's Third New International Dictionary* 491 (1993). According to Wornick, the MREs were "corrupted by association" (i.e., contaminated) because they contained dairy shake packets that were subject to a recall.

Houston Casualty's argument, by contrast, is premised on the position that a recall of a product's ingredients, alone, does not qualify as a contamination. Reading the Policy as a whole, Houston Casualty argues, there must be an "actual contamination" (i.e., "a test positive for salmonella") of the insured's product to trigger coverage.

9

For the reasons that follow, the Court finds that Wornick did not suffer a "contamination" under the terms of the Policy.  The Policy does not define "contamination," so the Court will construe the term in accordance with its "natural and commonly accepted meaning."  *See United Nat. Ins. Co.*, 182 F.3d at 449–50.  "To ascertain the common meanings of terms or phrases not defined in the language of contracts, Ohio courts routinely turn to dictionaries."  *Textileather Corp. v. GenCorp Inc.*, 697 F.3d 378, 382 (6th Cir. 2012).  "Contamination" and the verb "contaminate" have slightly different meanings, depending on which dictionary is consulted.  Significantly, all but one consulted by the Court define "contamination" in terms of a product's contact or mixture with a pollutant.  For example, *Black's Law Dictionary* defines "contamination" as the "[c]ondition of impurity resulting from mixture or contact with foreign substance."  *Black's Law Dictionary* 318 (6th ed. 1990).  The *Oxford English Dictionary* defines "contaminate" as "to render impure by contact or mixture; to corrupt, defile, pollute, sully, taint, infect."  *Oxford English Dictionary* (2d ed. 1989).  *See also, e.g.*, *American Heritage Dictionary of the English Language* (3d ed. 1992) (defining "contaminate" as "[t]o make impure or unclean by contact of mixture."); *Webster's II New College Dictionary* (2001) (same).  Merriam-Webster provides the broadest definition, defining "contaminate" as "[t]o soil, stain, corrupt or infect by contact or association" or "to render unfit for use by the introduction of unwholesome or undesirable elements."  *Webster's Third New International Dictionary* 491 (1993).

These multiple dictionary definitions of "contamination" (or "contaminate") must be construed in a manner that is consistent with the term's use in the Policy.  Considering the language of the Policy as a whole, the Court is persuaded for two reasons that the term "contamination" does not encompass a product that is "corrupted by association," as Wornick suggests, but requires that the product be soiled, stained, corrupted, infected, or otherwise

10

rendered impure by contact or mixture.  *See Webster's Third New International Dictionary* 491 (1993); *Black's Law Dictionary* 318 (6th ed. 1990); *Oxford English Dictionary* (2nd ed. 1989). Language within the definition of Accidental Product Contamination reinforces this interpretation.  First, the Policy requires that the contamination occur during the "manufacture, blending, mixing, compounding, packaging, labeling, preparation, production or processing" of the insured's product (or its ingredients or components).[5]  This requirement suggests that the product must come in contact with some sort of substance or foreign object.

Second, in light of the Policy's requirement that the consumption or use of the product has "resulted, or may likely result in . . . physical symptoms of bodily injury, sickness or disease or death," Doc. 1-1 at Page ID # 19, it is natural to interpret the term "contamination" is interpreted to mean that the product has come in contact with some sort of contaminate. Wornick's interpretation of the term contamination, which would permit corruption by association, does not fit within the broader definition of Accidental Product Contamination, which requires a risk of bodily injury, sickness or disease.

In sum, the language of the Policy does not allow for Wornick's broad interpretation. In the Policy at issue, the term "contamination" requires that the insured's product be soiled, stained, corrupted, infected, or otherwise made impure by contact or mixture.  There is no evidence before the Court that Wornick's products (including their ingredients or components)

---

[5]   Use of the language "ingredients or components" indicates that the Policy covers instances where the insured incorporates a contaminated ingredient into the insured's product.  However, that phrase is not helpful to Wornick because it is undisputed that (1) salmonella contamination was only found in one lot of dairy shake packets (Lot #9133) and (2) none of the product in Lot #9133 was sold to Wornick.  *See* Wornick's Response to Proposed Undisputed Facts, Doc. 24-1 at Page ID # 653-54.  Thus, Wornick did not incorporate a contaminated ingredient into the MREs.

came into contact with salmonella.  As such, the MREs have not been "contaminated" within the meaning of the Policy.

### ii.  Impairment

Wornick also argues that the recall of dairy shake packets allows for a finding that the MREs fall within the scope of the Policy because they have been "impaired" under the terms of the Policy.  The Court disagrees.

Accidental Product Contamination is

> (1) Any accidental or unintentional contamination, **impairment** or mislabeling (including mislabeling of instructions for use) during the manufacture, blending, mixing, compounding, packaging, labeling, preparation, production or processing (or storage on the premises of the Named Insured), of the Named Insured's PRODUCTS (including their components), or PUBLICITY implying such, or

> (2) Fault in design specification or performance of the Named Insured's PRODUCT(S)

> **provided always that** the consumption or use of the Named Insured's CONTAMINATED PRODUCT(S) has, within 120 days of such consumption or use, either resulted, or may likely result, in: (1) physical symptoms of bodily injury, sickness or disease or death of any person(s) and/or (2) physical damage to (or destruction of) tangible property, including animals and/or livestock – other than PRODUCT(S) of the Named Insured.

*Id*. at Page ID # 19 (emphasis added).  As with the term "contamination," the Policy does not define "impairment."  Again, the parties offer differing interpretations.

Wornick argues that the Court should define the term broadly to include circumstances that diminish the product's value.  Wornick's position is that the contamination of dairy shake packets constitutes an impairment under the Policy because the MREs' value was diminished as a result of the subsequent recall of dairy shake packets.  Houston Casualty argues that Wornick's

broad interpretation of the term disregards the context of the Policy and that "impairment" should be defined in terms of a defect or flaw in the product itself.

Houston Casualty relies heavily on *Ruiz Food Prods., Inc. v. Catlin Underwriting U.S., Inc., et al*., No. 1:11-cv-00889, 2012 WL 4050001 (E.D. Cal. Sept. 13, 2012)*, wherein the District Court interpreted the term "impairment" in the context of an accidental product contamination policy under strikingly similar circumstances*. Ruiz produces frozen Mexican food products for distribution. *Id*. at *1. One of Ruiz's products, the Tornado (a ready-to-eat beef product similar to a burrito), contains a beef spice mix; the beef spice mix contains hydrolyzed vegetable protein ("HVP"). *Id*. HVP is manufactured by another company, Basic Food Flavors ("Basic"). *Id*. Basic issued a recall for its HVP products after the FDA detected salmonella on Basic's food processing equipment and in a lot of finished HVP. *Id*. Ruiz then issued a recall of its Tornado products because it incorporated HVP that was subject to the recall. *Id*. at *2. After extensive testing, no salmonella was found in any of Ruiz's Tornado products. *Id*.

Ruiz submitted a claim under an accidental contamination policy issued by Catlin. Similar to the policy at issue here, the *Ruiz* policy provided coverage for "any accidental or unintentional contamination, impairment or mislabeling of an Insured product(s) . . . ." *Id*. Catlin denied coverage for the claim after discovering that Ruiz's Tornado product was not actually contaminated with salmonella. *Id*. at *3. Ruiz argued that the recall of HVP, which then required the recall of its Tornado product, constituted an "impairment" for purposes of the policy. The court disagreed, finding that "impairment must be to the product itself, and not as a result of the collateral circumstances surrounding the product." *Id*. at *10. Citing *Black's Law Dictionary*, the court determined that "[t]he mere potential contamination of Ruiz' ingredients

13

does not result in an 'Insured product' being 'damaged, weakened or diminished,' and also does not result in a 'diminish[ed] value' of the product itself.'" *Id.* The court further stated:

> The Policy is a "Product Contamination Insurance Policy" and is not a recall insurance policy. The Policy covered the product. Some defect in the product itself is required to trigger coverage . . . The "potential" of a defect in a product does not "impair" the product itself. Any interpretation of "impairment" to incorporate "recall," without a concomitant taint in the product, is a strained and unreasonable interpretation.

*Id.*

The Court agrees with the reasoning in *Ruiz*. Construing the Policy as a whole, it is clear that neither the recall of dairy shake packets nor the inclusion in the MREs of diary shake packets that would later be subject to a recall constitute an "impairment" as that term is used in the definition of Accidental Product Contamination in this specific policy. Rather, "impairment" should be interpreted more narrowly to mean damaged, weakened, or diminished due to a defect or flaw in the product itself. *Black's Law Dictionary* defines the noun "impairment" as: "[t]he fact or state of being damaged, weakened, or diminished." *Black's Law Dictionary* (9th ed. 2009). The verb "impair" means "[t]o diminish the value of (property or a property right)." *Id. See also Webster's Third New International Dictionary* 1131 (1993) ("diminish in quality, value, excellence, or strength."). But, as with the term "contamination," "impairment" must be read in the context of the Policy. The "impairment" must occur "during the manufacture, blending, mixing, compounding, packaging, labeling, preparation, production or processing" of the insured's product and the "impairment" must have "resulted, or may likely result in . . . physical symptoms of bodily injury, sickness or disease or death." Doc. 1-1 at Page ID # 19. As in *Ruiz*, these two requirements indicate "that the impairment must be to the product itself, and not as a result of the collateral circumstances surrounding the product." 2012 WL 4050001 at *10. In a

14

vacuum, the term impairment *could* encompass anything that diminished the value of the insured's product; however, the term is not reasonably susceptible to this meaning when read in the context of the Policy as a whole.  Accordingly, the Court finds that the MREs were not "impaired" within the meaning of the Policy.

### iii.    Fault in Design Specification or Performance

A "fault in design specification or performance" of the MREs also could amount to an Accidental Product Contamination under the Policy, so long as the "consumption or use of the [MREs] . . . [has] resulted, or may likely result in . . . physical symptoms of bodily injury, sickness or disease or death."  The Policy, Doc. 1-1 at Page ID # 19.

Wornick argues that the MREs failed to meet design specifications as a result of the contamination incident and subsequent recalls of NFDM and dairy shake packets.  That is, in its contract with the Government, Wornick warranted that the MREs were "free from defects in material or workmanship."  *See* Doc. 22-27 at Page ID # 568.  When the NFDM and dairy shake packets were recalled, the Government "determined that the MREs did not meet this requirement" and required Wornick to rework approximately 700,000 cases of MREs.  Wornick Mot., Doc. 22-29 at Page ID # 605.  Thus, Wornick claims that the MREs suffered from a "fault in design specification" because they were "rejected" by the Government on account of the recall.

Houston Casualty argues that the MREs did not suffer from a "fault in design specification or performance" merely because one component of the MREs was recalled and the Government required Wornick to rework the MREs.

In their cross-motions, responses, and replies, the parties devote four paragraphs to this argument.  Consequently, the evidence related to this argument is sparse and consists of the

15

following: (1) Wornick's contract with the Government contains a clause warranting that "all supplies . . . [will] be free from defects in material or workmanship and will conform with all requirements of this contract" (Clause 52.246-9P35 Warranty of Supplies);[6] (2) on July 21, 2009, the Government informed Wornick of its intent to invoke the Warranty of Supplies clause after the NFDM and dairy shake packet recalls;[7] (3) on September 2, 2009, the Government invoked the terms of a different contractual provision (Clause 52.211-9P36 FDA Compliance)[8] and required Wornick to rework a substantial number of MREs;[9] (4) in a letter dated September 4, 2009, Wornick's counsel wrote to the DLA and contested the Government's invocation of contractual provisions and remedies, making repeated reference to the "specifications and performance requirements" for the MREs;[10] and (5) included in the Policy's definition for Accidental Product Contamination is a "fault in design specification or performance of the Named Insured's PRODUCT(S) . . . ."[11]

The Court finds that the evidence, albeit scant, is sufficient to create a genuine issue of fact on the question of whether the MREs suffered a fault in design specification or performance amounting to an Accidental Product Contamination. While the Policy defines Accidental Product Contamination to include situations where there is a "fault in design specification or performance," the Policy does not further define those terms. Doc. 1-1 at Page ID # 19. The record indicates that the contract between Wornick and the Government contains certain "specifications" with regard to the MREs and their component parts, though it is unclear what

---

[6]  Doc. 22-27 at Page ID # 568 (email containing full text of warranty clause).
[7]  Doc. 22-8 at Page ID # 288 (letter dated 9/25/2009).
[8]   The text of Clause 52.211-9P36 has not been provided to the Court.
[9]  Doc. 22-11 at Page ID # 300 (letter dated 9/2/2009).
[10]   Doc. 20-3 at Page ID # 225.
[11]   Doc. 1-1 at Page ID # 19.

those specifications require. *See* Doc. 20-3 at Page ID # 225. The record indicates that the

Government "rejected" the MREs containing recalled dairy shake packets, citing an "FDA

Compliance" clause. *Id*; Doc. 22-11 at Page ID # 300. The lack of proof with respect to the

"specifications" in the contract between Wornick and the Government, the FDA Compliance

clause in that same contract, and the parties' intent with respect the phrase "fault in design

specification or performance" in the Policy precludes a finding in favor of either party.

###### iv.    Publicity

Wornick's final argument concerning the definition of Accidental Product Contamination

involves the Policy's publicity coverage. According to the Policy, publicity also can amount to

an Accidental Product Contamination:

> ACCIDENTAL PRODUCT CONTAMINATION shall mean:
>
> > (1) Any accidental or unintentional contamination, impairment or mislabeling (including mislabeling of instructions for use) during the manufacture, blending, mixing, compounding, packaging, labeling, preparation, production or processing (or storage on the premises of the Named Insured), of the Named Insured's PRODUCTS (including their components), or **PUBLICITY implying such**, or
> >
> > (2) Fault in design specification or performance of the Named Insured's PRODUCT(S)
>
> **provided always that** the consumption or use of the Named Insured's CONTAMINATED PRODUCT(S) has, within 120 days of such consumption or use, either resulted, or may likely result, in: (1) physical symptoms of bodily injury, sickness or disease or death of any person(s) and/or (2) physical damage to (or destruction of) tangible property, including animals and/or livestock – other than PRODUCT(S) of the Named Insured.

Doc. 1-1 at Page ID # 19 (emphasis added). The Policy then defines "Publicity" as

> The reporting of an actual or alleged ACCIDENTAL PRODUCT CONTAMINATION during the Policy Period in local, regional or national media (including but not limited to radio, television, newspapers, magazines or the

> Internet) or **any governmental publication** where the Named Insured's
> PRODUCT(S) and the Named Insured are specifically named.

*Id*. at Page ID # 20 (emphasis added).

Wornick argues that three Government reports triggered the Policy's publicity requirement: (1) ALFOODACT 131-2009 ("AFA 131"); (2) ALFOODACT 139-2009 ("AFA 139"); and (3) the DLA report.

Houston Casualty first argues that neither AFA 131, AFA 139, nor the DLA report are "governmental publications" and, thus, they do not meet the definition of Publicity and therefore cannot be the foundation for an Accidental Product Contamination. Houston Casualty then argues that even if AFA 131, AFA 139, and the DLA report are governmental publications, Wornick still cannot satisfy the "consumption and use" requirement[12] in the definition of Accidental Product Contamination because the MREs did not contain salmonella and, therefore, posed no actual threat. Finally, Houston Casualty argues that Wornick's losses did not "result[] directly" from either AFA 131, AFA 139, or the DLA report, as required by the Policy.[13]

Contrary to Houston Casualty's contentions, the record is clear on one point: all three sources, AFA 131, AFA 139, and the DLA report, are "governmental publications" for purposes of the definition of Publicity. From there, however, the record is less clear.

---

[12]  The phrase requiring "the consumption or use of the Named Insured's CONTAMINATED PRODUCT(S) has, within 120 days of such consumption or use, either resulted, or may likely result, in: (1) physical symptoms of bodily injury, sickness or disease or death of any person(s) and/or (2) physical damage to (or destruction of) tangible property, including animals and/or livestock – other than PRODUCT(S) of the Named Insured."  *Id*. at Page ID # 19.

[13]  Again, the Policy states that "[t]he Company agrees to indemnity the Named Insured for LOSS *resulting directly* from an ACCIDENTAL PRODUCT CONTAMINATION first discovered by the Named Insured during the Policy Period."  *Id*. at Page ID # 17 (emphasis added).

Houston Casualty's argument concerning the "consumption and use" requirement presents an interesting question that, without more evidence, the Court simply cannot answer. Houston Casualty is correct that the Policy requires Wornick to prove that "the consumption or use of the [MREs] has . . . either resulted, or may likely result, in . . . physical symptoms of bodily injury, sickness or disease or death," even in the case of a publicity claim.  However, the Court finds this requirement inconsistent with the Policy's publicity coverage.  The Policy provides coverage for situations where losses result from publicity implying that an accidental or unintentional contamination, impairment or mislabeling has occurred.  The definition of Publicity includes "reporting of an actual *or alleged*" Accidental Product Contamination, expanding coverage to situations where actual contamination, impairment, or mislabeling has not yet been demonstrated.  Doc. 1-1 at Page ID # 20.  If the "consumption and use" provision requires likely or actual physical symptoms or physical damage in the event that there is merely publicity that *implies* contamination of the product, the inclusion of the word "alleged" would be meaningless.  *See Affiliated FM Ins. Co. v. Owens–Corning Fiberglas Corp.*, 16 F.3d 684, 686 (6th Cir.1994) (applying Ohio law) ("In construing a contract, a court . . . must give meaning to every paragraph, clause, phrase and word, omitting nothing as meaningless, or surplusage[.]").

Moreover, the Court also finds that material issues of fact exist as to whether or not Wornick's losses directly result from the publication of AFA 131, AFA 139, and the DLA report. Houston Casualty argues that Wornick's losses stemmed from the Plainview recall and the Government's decision to require that Wornick rework the MREs, not from any publication.  In support of this argument, Houston Casualty cites a letter directed to Wornick from the Government which indicates that the Government took action against Wornick based on the Plainview recall.  *See* Doc. 22-8 at Page ID # 288.  Conversely, the record indicates that at least

19

one of the three publications—AFA 131, which was issued July 1, 2009—was  published prior to the Government's letter notifying Wornick of its intent to invoke the breach of warranty clause. *See* Doc. 22-6 at Page ID # 279 and Doc. 22-8 at Page ID # 288.  Thus, a dispute remains as to whether Wornick's losses directly result from one of the publications.

### D.  Bad Faith

Houston Casualty has moved for summary judgment on Wornick's bad faith claim, arguing that the bad faith claim should fail for the same reasons that the breach of contract and declaratory judgment claims should fail—namely, that there is no coverage under the Policy. Because the Court is denying both summary judgment motions on the substantive coverage claims (Counts I and II), the Court concludes that it is more prudent to deny summary judgment as to the bad faith claim until the breach of contract and declaratory judgment claims can be resolved.

## IV.  CONCLUSION

In sum, while the Court finds that the MREs have not been "contaminated" or "impaired" within the meaning of the Policy, issues of fact remain as to:

(1) whether the MREs suffered a fault in design specification or performance amounting to an Accidental Product Contamination;

(2) whether AFA 131, AFA 139, and/or the DLA report provide a basis for coverage under the Policy's Publicity coverage; and

(3) whether Houston Casualty acted in bad faith in denying Wornick's claims.

The Court **DENIES** both Houston Casualty's Motion for Summary Judgment (Doc. 20)

and Wornick's Motion for Partial Summary Judgment (Doc. 22).


IT IS SO ORDERED.

S/Susan J. Dlott_____
Chief Judge Susan J. Dlott
United States District Court
